Submitted on record and briefs February 2, reversed October 3, 2001

Jo A. SCHIFFNER,
*Respondent,*

*v.*

Roger W. BANKS,
*Appellant.*

99C-20003; A109203 (Control)

Aubrey R. ROGERS,
*Respondent,*

*v.*

Roger Warren BANKS,
*Appellant.*

99C-20004; A109204
(Cases Consolidated)

33 P3d 701

David L. Carlson filed the brief for appellant.

Respondent Jo A. Schiffner filed the brief *pro se*. Respondent Aubrey R. Rogers joined the brief by letter.

Before Haselton, Presiding Judge, and Deits, Chief Judge, and Wollheim, Judge.

WOLLHEIM, J.

Deits, C. J., concurring in part and dissenting in part.

## WOLLHEIM, J.

■ Respondent Roger Banks appeals from the trial court's issuance of stalking protective orders (SPOs) in favor of petitioners Aubrey Rogers and Jo Schiffner.[1] We review *de novo, Hanzo v. deParrie*, 152 Or App 525, 537, 953 P2d 1130, *rev den* 328 Or 418 (1998), and conclude that petitioners failed to prove that they had experienced "alarm" as a result of contacts with respondent. ORS 163.738(2)(a)(B)(i). Accordingly we reverse.

Respondent and petitioners were coworkers. Tension between respondent and petitioners apparently began in 1998 when Schiffner chose Rogers rather than respondent for a promotion. Respondent suspected that Schiffner and Rogers were having an affair and believed that Rogers had received the promotion because of that relationship. Consequently, respondent filed an internal ethics grievance with his employer, which was ultimately rejected for of lack of evidence. In September 1998, respondent resigned from his position in lieu of discharge.

Respondent decided to obtain proof of the suspected affair and determined that the most likely time for illicit meetings would be early in the mornings when Rogers ordinarily worked out at a gym. At about 5:00 a.m. on December 8, 1998, respondent drove near Rogers's home and saw that Rogers's truck was not there. He then went to the gym where Rogers usually worked out and confirmed that Rogers's truck was not there. Finally, respondent proceeded to Schiffner's apartment, where he found Rogers's truck parked nearby. Respondent took photographs both of Rogers's truck and of Schiffner's apartment complex.

---

[1] In civil stalking proceedings, the party applying for relief is denominated the "petitioner" and the party against whom relief is sought is the "respondent." Obviously, that nomenclature can be confusing in an appeal like this, where the "respondent" below is the appellant, and the "petitioner" below is the respondent. Thus, for consistency and in accordance with our own rules governing the designation of parties in briefs, ORAP 5.15, all references to "respondent" are to Banks and all references to "petitioners" are to Rogers and Schiffner collectively. Nevertheless, for clarity, we will refer to each petitioner individually by his or her surname.

On December 11 and December 28, 1998, respondent again drove past Rogers's home and gym early in the morning to verify Rogers's absence and then proceeded to Schiffner's apartment. On both of those occasions, he again took photos of Rogers's truck and of Schiffner's apartment complex. During the December 11 episode, respondent waited and watched Schiffner's door until he observed Rogers leave at 6:20 a.m. On December 28, one of Schiffner's neighbors "nearly stumbled" over respondent as he was poised with a video camera, waiting to film Rogers leaving Schiffner's apartment. Concerned that he "had been discovered," respondent abandoned his efforts to document the suspected affair further.

Although the record is unclear, it appears that Schiffner became aware of respondent's presence outside her apartment on at least one of those occasions. There is no evidence that she told anyone about respondent's conduct or expressed any contemporaneous concern about, or experienced any contemporaneous apprehension from, his presence outside her apartment.

From December 28, 1998, to August 16, 1999, respondent's interactions with petitioners—both direct and indirect—ceased. Then, between August 16, 1999, and December 15, 1999, respondent had several conversations with four people—Hemmer, Scott, Parks, and Pilgrim[2]—about his past employment and his efforts to document petitioners' suspected affair. During respondent's conversations with Hemmer, Scott, and Pilgrim, he became visibly angry to the point that they were each concerned that respondent might act violently towards petitioners. For example, Pilgrim testified that "in light of everything that goes on in our society today and all of the other violence and things that take place, that I felt that there could have been some potential harm with regards to [petitioners]." Consequently, they each

---

[2] At the time of those conversations, Hemmer and Pilgrim worked at Oregon Department of Transportation, Scott was an ex-employee of the Public Utilities Commission and was acquainted with Rogers, and Parks was a coworker of respondent, who at that time was working as a temporary employee at the Oregon Vocational Rehabilitation Division. Because the trial court relied on respondent's conversation with Parks, we recount the substance of that conversation in some detail.

related the substance of those conversations either to their supervisors or to petitioners directly.

Respondent's conversation with Parks occurred on November 23, 1999, during a break from work. In that conversation, respondent told Parks that he had been "blacklisted" by the state and explained how he had been denied a promotion as a consequence of an affair between a male coworker and his female supervisor. Respondent went on to tell Parks how he had waited outside his female coworker's apartment and had taken photographs to document the affair.

During that conversation, respondent neither threatened petitioners nor mentioned petitioners by name. At one point during the conversation, in response to a question from Parks, respondent noted that he did have a permit to carry a concealed weapon.[3] But as Parks testified, respondent "didn't appear angry or hostile. I thought he thought of himself to me more of a victim than anything else." Nevertheless, Parks was concerned by respondent's efforts to document the suspected affair. Consequently, Parks later mentioned the conversation to a coworker, who urged her to tell her supervisor. On December 2, 1999, acting on that advice, Parks discussed the conversation with her supervisor.

■ On December 3, 1999, petitioners filed stalking complaints against respondent with the Oregon State Police. ORS 163.744. After two evidentiary hearings on those complaints, the circuit court issued the permanent SPOs sought by petitioners in January 2000. In a letter ruling accompanying those orders, the court stated:

> "I find that a Stalking Order should be issued in favor of Petitioners Schiffner and Rogers since [Banks] admitted that he had 'contacted' them as that term is used in ORS 163.730(3)(c) by waiting outside their home. Mr. Banks admitted taking photographs of [Rogers's] vehicle when it was parked at [Schiffner's] home. [Parks] testified that [Banks] had spoken with her about his negative feeling

---

[3] Respondent owned several firearms and commonly carried a handgun in his car, including during December 1998. Petitioners knew that respondent owned firearms.

towards [Schiffner] and [Rogers] and in the same conversation stated that at that time he had a concealed weapons permit. I do believe that it is objectively reasonable for [Schiffner] and [Rogers] to be alarmed by [Banks's] 'contact.' "

On appeal, respondent argues that the circuit court erred in issuing the SPOs because the testimony at hearing failed to demonstrate, by a preponderance of the evidence, that the statutory requirements for granting an SPO were satisfied. ORS 163.738(2)(a)(B). As amplified below, we conclude that respondent's conduct in attempting to document the suspected affair on December 8, 11, and 28, 1998, constituted "repeated and unwanted contact." ORS 163.738(2)(a)(B)(i). However, we further conclude that respondent's conversations with third parties in the fall of 1999 did not constitute "contacts" within the meaning of the anti-stalking statutes. Finally, we conclude that petitioners failed to prove that they were alarmed or coerced by the December 1998 contacts as opposed to the fall 1999 events. Because proof of alarm or coercion arising from repeated and unwanted contacts is a prerequisite to the issuance of an SPO, *see* ORS 163.728(2)(a)(B)(i), the court erred in issuing the SPOs.[4]

■ ORS 163.738(2)(a)(B) allows a court to enter:

"A court's stalking protective order if the court finds by a perponderance of the evidence that:

"(i) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(ii) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

---

[4] Respondent also assigns error to the form SPO's prohibition against "[c]ommunicating with business or government entities with the intent of affecting some right or interest of the petitioner or the person to be protected if other than the petitioner." Defendant correctly notes that that language was derived from a former definition of "contact," ORS 163.730(3)(i) (1993), and has since been modified. *See* Or Laws 1995, ch 353, § 1. Given our disposition, we need not reach, and do not decide, that question.

"(iii) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

In construing the statute, we look first to its text in context, giving common words their "plain, natural and ordinary meaning." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). The unambiguous requirements of subparagraph (i) are several: the person against whom the SPO is sought must act with intent— either intentionally, knowingly or recklessly; that action must constitute a contact as defined by ORS 163.730(3); that person's contacts must be repeated and unwanted by the other person; the contacts must be with the person seeking the SPO or with a member of that person's immediate family or household as defined by ORS 163.730(4), (5); and the contact must cause alarm to or coerce the other person as defined by ORS 163.730(1), (2).

That last requirement warrants further examination because of its relevance to the facts presented here. The plain language of the statute indicates that there must be a causal relationship between the contact and the alarm or coercion felt by the other person—the alarm or coercion must arise from the contact. Because the legislature did not limit the proximity of that causal relationship, the contexts from which the causal relationship may occur are diverse. Perhaps most obvious is where alarm arises contemporaneously with the contact. In that instance, there is no question that the alarm has arisen directly from the contact. However, there are also instances where alarm may arise from a contact, yet not contemporaneously with the contact. First, a person may become aware of a contact that initially raises no concern to the other person, yet upon later reflection by the other person causes that person alarm. Second, the other person may be unaware of a contact or a series of contacts, but when the person later learns of the contact(s), the person becomes alarmed. *See Boyd v. Essin*, 170 Or App 509, 517, 12 P3d 1003 (2000), *rev den* 331 Or 674 (2001) ("It is sufficient if the act, *when learned*, gives rise to an unwanted relationship or association between the petitioner and the respondent."

(Emphasis added.)). Finally, instances may arise where the other person initially believes a contact to be innocuous but, upon obtaining further information about the person initiating the contact or the true nature of the contact itself, later understands the contact in a new light and only then becomes alarmed. The key to each of the above contexts, for purposes of determining whether or not an SPO should be issued, is that the alarm must arise from the contacts and not independently from events or information that do not constitute contacts under the statutory provision. And although the context surrounding the contacts may give added meaning to the contacts, *see Weatherly v. Wilkie*, 169 Or App 257, 263, 8 P3d 251 (2000) (context of parties' history may give contacts added import or ominous meaning), the statute unambiguously requires that the other person's alarm arise from the contacts.[5]

■ The remaining subparagraphs, (ii) and (iii), limit when an SPO may be issued. The unambiguous language of subparagraph (ii) requires that the other person's alarm or coercion be objectively reasonable. Subparagraph (iii) limits the type of alarm that will warrant issuance of an SPO: the other person's alarm must be for his or her *personal* safety or the *personal* safety of an immediate family member or household member. Only when all of the above requirements and limitations are met may a court issue an SPO.

With the statute so understood, our disposition turns on the resolution of two issues: First, did respondent

---

[5] Two hypotheticals may illustrate the distinction between contextually informed alarm arising from a contact and alarm arising from later "noncontact" conduct or expression:

(1) "A" gives "B" a rose. Thereafter, "A" learns that "B" gives roses only to people he intends to kill.

(2) "C" gives "D" a rose. Weeks later, "D" learns that "C" is very angry at her and has told an entirely unrelated third-party, "E," that he intends to kill "D."

The first hypothetical is actionable under the anti-stalking statutes in that B's alarm arises from the contact: The subsequently learned information permitted B to understand the threatening nature of the contact. Conversely, the second hypothetical, assuming that C's conversation with E is not itself a contact, is not actionable in that D's alarm arises not from the contact, the giving of the rose—which, in fact, was nonthreatening—but from C's subsequent threatening statements.

engage in repeated and unwanted contact with either petitioner—and, if so, what precisely were those contacts? And, second, did petitioners actually experience alarm or coercion arising from those contacts?[6]

We first address what conduct by respondent constituted contacts within the meaning of the anti-stalking statutes. ORS 163.730(3). On appeal, as at hearing, petitioners argue that the universe of potentially actionable contacts include both respondent's conduct in December 1998 and his subsequent conversations with third parties between August and November 1999. Respondent acknowledges that his attempt to document the affair in December 1998 arguably constitute contacts but asserts that his subsequent conversations with third parties—and particularly the conversation with Parks on which the trial court relied—were not contacts for purposes of ORS 163.730(3).[7]

---

[6] As amplified below, we find that neither petitioner actually experienced alarm from any contact. Consequently, we do not address whether such alarm, if it had been experienced, would have been objectively reasonable. *See* ORS 163.738(2)(a)(B)(ii). Furthermore, given our analysis, we do not address respondent's additional arguments pertaining to his alleged lack of intent to alarm or coerce petitioners.

[7] ORS 163.730(3) defines "contact" for purposes of ORS 163.378(2)(a)(B):

" 'Contact' includes but is not limited to:

"(a) Coming into the visual or physical presence of the other person;

"(b) Following the other person;

"(c) Waiting outside the home, property, place of work or school of the other person or of a member of that person's family or household;

"(d) Sending or making written communications in any form to the other person;

"(e) Speaking with the other person by any means;

"(f) Communicating with the other person through a third person;

"(g) Committing a crime against the other person;

"(h) Communicating with a third person who has some relationship to the other person with the intent of affecting the third person's relationship with the other person;

"(i) Communicating with business entities with the intent of affecting some right or interest of the other person;

"(j) Damaging the other person's home, property, place of work or school; or

"(k) Delivering directly or through a third person any object to the home, property, place of work or school of the other person."

■ Respondent is correct. Turning first to respondent's conduct *vis-à-vis* Schiffner, respondent admits that, on three occasions in December 1998, he waited outside her apartment so he could obtain proof of the suspected affair. That conduct is explicitly covered by ORS 163.730(3)(c), which defines "contact" to encompass "[w]aiting outside the home * * * of the other person."

■ Conversely, respondent's later conversations with Hemmer, Scott, Parks, and Pilgrim do not constitute contacts as defined by ORS 163.730(3). In particular, although respondent expressed anger and frustration towards petitioners in those conversations, we are not persuaded that those conversations represented either an attempt to "communicate with [petitioners] through a third person," ORS 163.730(3)(f), or an intentional effort by respondent to affect petitioners' relationship with those persons. ORS 163.730(3)(h). Accordingly, those conversations do not fit into any of the enumerated types of contacts in ORS 163.730(3).[8] Even if those conversations did fit into one of the enumerated categories, they would not constitute "contacts" in this instance. The Supreme Court has held that "a contact based on communication must consist of a threat that convincingly expresses *to the addressee* the intention that it will be carried out, and that the actor has the ability to do so." *State v. Rangel*, 328 Or 294, 306, 977 P2d 379 (1999) (emphasis in original). Because the 1999 conversations were with third parties and did not contain any direct threats to petitioners, they do not constitute contacts.

■ A similar, albeit not identical, analysis applies to respondent's alleged contacts with Rogers. As noted, on more than one occasion in December 1998 respondent drove by Rogers's house to see whether Rogers was home, drove to Schiffner's apartment in search of Rogers, and then waited until he saw Rogers leave her apartment. The term "contact"

[8] Petitioners do not contend that, even if the third-party conversations do not fall within the enumerated types of contacts, ORS 163.730(3)(a)-(k), those conversations may nevertheless somehow be broadly encompassed within the statute's "includes but is not limited to language." *See Boyd*, 170 Or App at 517 (For an act to constitute a contact under the "includes but not limited to" language of ORS 163.730(3), it must necessarily "give[ ] rise to an *unwanted relationship or association* between the petitioner and the respondent.").

encompasses both "[f]ollowing the other person," ORS 163.730(3)(b), and "[c]oming into the visual or physical presence of the other person," ORS 163.730(3)(c). Respondent, by effectively following Rogers to Schiffner's apartment and then watching Rogers leave her apartment, both "followed" Rogers and came "within his visual or physical presence." *See State v. Maxwell*, 165 Or App 467, 474, 998 P2d 680 (2000) ("[A] person is within another's 'visual or physical presence' when the person is capable of being seen—whether or not the person is in fact seen—or when the person is within physical calling distance."). Thus, respondent's December 1998 conduct constitutes contacts with respect to Rogers. However, as with Schiffner, respondent's later conversations with third parties do not constitute contacts.

 The issue thus reduces to whether petitioners (or either of them) were actually alarmed because of the December 1998 contacts. ORS 163.730(1) defines "alarm," as "to cause apprehension or fear resulting from the perception of danger." *See also Delgado v. Souders*, 146 Or App 580, 587, 934 P2d 1132, *rev allowed* 326 Or 43 (1997) ("alarm," as it is used in ORS 163.730(1), "ultimately contemplate[s] a *reasonable apprehension of physical harm*" (emphasis added)).[9]

Here, petitioners adduced no proof of alarm or coercion arising from the December 1998 contacts. Rather, their alarm arises from the anger and frustration respondent expressed to others almost a year after the contacts stopped. Furthermore, petitioners offer no explanation how the 1999 conversations paint the December 1998 contacts in a new light sufficient to arouse alarm.

This is a very close case. The vehemence of respondent's 1999 conversations was sufficient to cause three people to report those conversations to others out of fear that respondent might resort to violence against petitioners. Furthermore, we have no doubt that the alarm expressed by petitioner Schiffner is genuine. However, the 1999 conversations

---

[9] ORS 30.866(1), which allows a person to bring a civil action to obtain an SPO, is materially indistinguishable from ORS 163.738(2)(a)(B), the statute pursuant to which the circuit court issued the SPO here. Thus, *Delgado's* discussion regarding the meaning of "alarm" in ORS 163.730 is instructive here.

and the alarm arising from those conversations cannot form the basis for issuing an SPO.

In sum, petitioners failed to prove that they were actually alarmed or coerced by the December 1998 contacts, as opposed to the 1999 conversations. Consequently, no matter how censurable or potentially embarrassing respondent's conduct may have been, the court erred in issuing the SPOs.

Reversed.

**DEITS, C. J.,** concurring in part and dissenting in part.

I agree with the majority that only respondent's December 1998 conduct—waiting and videotaping outside Schiffner's apartment, driving by Rogers's house, driving to Schiffner's apartment in search of Rogers, and waiting until Rogers left Schiffner's apartment—were "contacts" within the meaning of ORS 163.730(3). I also agree with the the majority that the stalking protective order (SPO) issued to Rogers should be reversed. I disagree, however, with the majority's conclusion that Schiffner did not experience alarm from the December 1998 contacts as informed by respondent's later actions. I would accordingly affirm the SPO issued to Schiffner.

The governing statute here is ORS 163.738, which provides, in part:

"(2)(a) * * * The court may enter:

"* * * * *

"(B) A court's stalking protective order if the court finds by a preponderance of the evidence that:

"(i) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(ii) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(iii) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal

safety of the victim or a member of the victim's immediate family or household."

I agree with the majority that, under ORS 163.738(2)(a)(B), "there must be a causal relationship between the contact and the alarm or coercion felt by the other person—the alarm or coercion must arise from the contact." 177 Or App at 92. In my opinion, Schiffner established that causal connection in this case.

The majority acknowledges that "the contexts from which the causal relationship may occur are diverse." *Id.* The majority sets out a number of those possible contexts, including "instances * * * where the other person initially believes a contact to be innocuous but, upon obtaining further information about the person initiating the contact or the true nature of the contact itself, later understands the contact in a new light and only then becomes alarmed." *Id.* at 93. According to the majority, the evidence that Schiffner presented was insufficient to establish that she was alarmed by the December 1998 contacts when she further understood their nature in light of information she later obtained about respondent. I disagree with that reading of the record.

In my view, the record in this case supports the conclusion that Schiffner was not initially alarmed in December 1998. The record, however, also supports the conclusion that, after Schiffner found out about respondent's continuing and virulent anger at her, she viewed respondent's presence outside her house and attempts to videotape her in a new light and was alarmed by them. Schiffner testified that "[a]lmost every morning when I get up before I turn on the lights I look outdoors to see if I can see him outside." That Schiffner now takes additional precautions based on her apprehension that respondent will repeat the kind of contact in which he engaged in December 1998 indicates to me that it is her knowledge of that contact itself—viewed through the lens of respondent's later conduct—that caused her alarm.

Schiffner presented sufficient evidence to establish that she experienced actual, reasonable apprehension for her personal safety because of respondent's December 1998 contacts after she became aware of his later interactions with third parties. Because I would hold that Schiffner established

actual, reasonable apprehension for personal safety as required by ORS 163.738(2)(a)(B)(iii), I would reach respondent's argument that Schiffner's alarm was not objectively reasonable as required by ORS 163.738(2)(a)(B)(ii). ORS 163.738(2)(a)(B)(ii) requires that it be "objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact" before a stalking protective order may issue. "Alarm" is defined to mean "to cause apprehension or fear resulting from the perception of danger." ORS 163.730(1). We have construed "danger" to involve a reasonable apprehension of physical harm. *Delgado v. Souders*, 146 Or App 580, 587, 934 P2d 1132, *rev allowed* 326 Or 43 (1997). The question is not whether any of us would have felt apprehension or fear from the perception of danger of physical harm as a result of respondent's December 1998 contacts. The question is whether Schiffner's alarm was objectively reasonable.

That question must be answered in light of the surrounding circumstances that make up a victim's "situation." ORS 163.738(2)(a)(B)(ii). In assessing whether a petitioner's alarm is objectively reasonable, we must consider contacts both collectively and in the context of the parties' relationship and other circumstances known to the petitioner. *See Boyd v. Essin*, 170 Or App 509, 518, 12 P3d 1003 (2000), *rev den* 331 Or 674 (2001). In *Boyd*, we stated that contacts that might appear innocuous when viewed in isolation may take on a different character when viewed in the context of other behavior by a respondent. *Id. See also Weatherly v. Wilkie*, 169 Or App 257, 263, 8 P3d 251 (2000) (context of the parties' history may give contacts "added import or ominous meaning"). Viewed in context, the alarm experienced by Schiffner was objectively reasonable. She knew that respondent was angry at her because he believed that the affair had caused Schiffner to pass him over for a promotion. He had been upset enough about that incident to file a grievance. She also knew that he had a permit for a gun.

In my opinion, the lapse of time between the contacts and the filing of the stalking petition supports, rather than undercuts, the reasonableness of Schiffner's alarm. That respondent was still angry more than eight months later

about an incident involving petitioners could cause a reasonable person to be alarmed that respondent was obsessive about what he perceived as unfairness on Schiffner's part. Several of the third-party witnesses testified that, when respondent approached them, he became upset to the extent that it affected him physically. The third-party witnesses were not close friends of respondent's. Many were his former coworkers, who indicated that they did not know him well. However, when they ran into him by chance, nearly the first thing he brought up was how angry he was with petitioners. Viewed in that light, an objectively reasonable person who knew what respondent had said and how he had acted to the third-party witnesses could feel a level of alarm about the earlier contacts beyond what he or she had felt earlier. Schiffner's testimony is detailed enough to allow the inference that she was told sufficient substance of the third-party interactions to impute to her knowledge of those aspects of the interactions. I would conclude that Schiffner's alarm was "objectively reasonable" and, accordingly, would affirm the issuance of Schiffner's SPO.

Because I would affirm the issuance of Schiffner's SPO, I would reach respondent's second assignment of error. In that assignment, respondent contends that the trial court erred in including the following restriction in the SPO: "Communicating with business or government entities with the intent of affecting some right or interest of the petitioner or the person to be protected if other than the petitioner." Respondent argues that restrictions on contacts with government entities have not been permissible under the stalking statutes since the legislature removed the phrase "or government" from the above quoted definition of contact in 1995.

Respondent is correct. Under ORS 163.738(2)(b), a court may include in the list of types of contact from which a respondent must refrain "all contact listed in ORS 163.730 * * *." Communicating with a business entity is currently a form of contact listed in ORS 163.730(3)(i), but communicating with a government entity has not been a form of contact since 1995. Or Laws 1995, ch 353, § 1 (deleting phrase "or government" from ORS 163.730(3)(i)); Or Laws 1995, ch 353, § 12 (effective date of act June 14, 1995). The court erred in

entering an SPO that limited respondent's contacts with government entities, and I would remand with instructions to correct Schiffner's SPO to delete the phrase "or government."

As noted above, I concur with the majority's disposition as to Rogers's SPO. Rogers's testimony is far more cursory. The only indication in the record that Rogers knew what those witnesses had said is as follows:

"[The court]: Mr. Rogers, is your statement similar to these folks here; someone else told you that this man maybe made threats against you?

"A: Yes."

That testimony is not sufficient to establish, or to allow an inference, that Rogers knew enough of the substance of respondent's statements to the third-party witnesses to make any alarm he experienced "objectively reasonable." Accordingly, I concur in the majority's reversal of the issuance of Rogers's stalking protective order, but for the reasons discussed above I respectfully dissent from the majority's reversal of the issuance of Schiffner's stalking protective order.