Argued and submitted September 27, 2010, reversed March 14, 2012

Kathryn REITZ,
*Petitioner-Respondent,*

*v.*

Pedro Rolando Reynaud ERAZO,
*Respondent-Appellant.*

Washington County Circuit Court
C091843CV; A142110

274 P3d 214

Raymond S. Tindell argued the cause and filed the brief for appellant.

Trevor Hensley, Certified Law Student, argued the cause for respondent. On the brief were W. Warren H. Binford and Willamette University Clinical Law Program.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

DUNCAN, J.

## DUNCAN, J.

Respondent appeals the trial court's entry of a stalking protective order (SPO), arguing that the statutory requirements were not met.[1] We review *de novo*[2] and conclude that, at most, one actionable "contact" took place. Therefore, we reverse.

Petitioner and respondent are frequent shoppers at a Goodwill outlet store where all of their interactions took place. Both parties are particularly interested in the store's selection of books.[3] At the hearing on petitioner's request for an SPO, a former assistant manager of the Goodwill described the regular course of business at the store:

> "The way that product at this particular store comes in[ ] to be shopped at is it's wheeled in on large carts by staff. Generally when I was there we'd have people stand back and wait for [the carts to be wheeled into place], and then once we released them to dig through the bins, then they were free to, you know, do as they did. Most people would station [themselves] where they thought there would—they'd kind of look and say, 'Okay, I see a good set of books,' or whatever they were looking at, and they would station themselves appropriately to try to get there."

Chott, a frequent shopper at the store, described the scene around the book bins in the five minutes or so after the staff releases the shoppers to dig through the bins: "[Y]ou watch because it's kind of a social event. I mean it is—I hate to make light of it, but it's like the Three Stooges gone nuts, and you just watch."

When respondent began shopping at the store, two or three years before the hearing, he pioneered a new method of shopping for books using a handheld electronic scanner. As a result, the atmosphere at the store's book bins became more

---

[1] On appeal, we refer to the parties as designated in the trial court. ORAP 5.15.

[2] ORS 19.415 was amended in 2009. Or Laws 2009, ch 231, § 2. The amendments apply to appeals in which the notice of appeal was filed on or after June 4, 2009. Or Laws 2009, ch 231, § 3. Because the notice of appeal in this case was filed before that date, we apply the 2007 version of ORS 19.415, which provides for *de novo* review in a case such as this.

[3] Respondent is in the business of reselling books. Petitioner does not resell books, but she shops for books quite frequently.

aggressive. Cahill, a witness for petitioner who regularly shopped at the store, described her experience shopping for books there before respondent appeared on the scene:

"I had a little book business that I was involved in, and it was just a really nice little occupation. I would go every day, and I would just go and pick books, without a scanner, without any kind of apparatus or technology, and just go and pick books, * * * and I would go home with a nice couple, few bags of books and sell them online. And then by and by, one day I showed up after like, I don't know, a month or so I hadn't been, just kind of taking a break, and when I went back, there were all these people with scanners and technology and just grabbing books, and so I had to learn how to stay in the game * * *."

Respondent's method of shopping for books involved using handheld scanners to scan the barcodes on the books and determine which books were valuable. When a new group of books came out in a group of bins, respondent and several others, who worked as a group under respondent's direction, would "fill [their shopping carts] up, and to the exclusion of everyone else they will try to get every book they can get. And then they have a scanner, and they scan them, and then they throw back the ones they don't want[.]" One result of the change in technology was that respondent and his group would push their way into the crowd around the bins of books, attempting to pull all of the books into their carts before others could look at them.

Several witnesses testified that respondent's group was the most aggressive at the store. The former assistant manager stated:

"If there was something particularly nice or a good selection of books or whatever, in this case—keep in mind there's a line of people around [the area where the wheeled bin of books will be placed]—in this case if there was not space, [respondent and his group would make space by], you know, moving somebody aside or giving them an elbow or something like that."

Respondent's group also followed shoppers around from bin to bin, attempting to remove books before other shoppers could look at them. Cahill testified that respondent directed members of his group to

"shadow me, follow me. If I would go here, then 'go with her,' and then a person would come and follow me, and just follow me wherever I would go, * * * stand right next to me, elbow me, make it incredibly uncomfortable."

Although respondent and his group initiated the ruder behavior at the store, they were not alone in behaving badly. The new, more aggressive, atmosphere permeated the culture of the book shoppers at the store. The former assistant manager explained that "[t]here [were] other shoppers that caused issue[s]" as well; that is, they engaged in the same type of conduct that respondent did.

At the hearing on the SPO, petitioner complained of respondent's aggressive behavior toward her. She testified that he had pushed her while she was standing at a bin approximately 10 times in the previous two years and that he frequently followed her around the store. He also yelled at her and called her names while she shopped.

Petitioner also relied on two specific incidents.[4] First, petitioner relied on the fact that respondent had once told her that "[y]ou should be afraid of me, they're not going to stop me, I can do whatever I want." Second, petitioner relied on an incident that occurred a few days before she petitioned for the SPO. Petitioner was standing in an empty area where a bin of new books would soon be available for shopping when respondent and his sister came and stood next to her. When the books appeared and the shopping began, respondent began scooping up the books in front of petitioner. She reached out, and "he slugged me, full out slugged me * * * and I was knocked off balance." Petitioner complained to the store manager, the police were called, and respondent was arrested.

After the hearing, the trial court issued an SPO. Respondent appeals, arguing that petitioner's evidence did not satisfy the requirements of ORS 30.866, under which the trial court issued the SPO. That statute provides, in part:

---

[4] Although petitioner testified that she believed that respondent had once scratched her car with a key, we do not consider that alleged incident because it took place more than two years before the SPO petition was filed. *See* ORS 30.866(6) ("An action under this section must be commenced within two years of the conduct giving rise to the claim.").

"(1)   A person may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a person if:

"(a)   The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(b)   It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c)   The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

The first element required for an SPO is that a respondent's conduct meets the statutory definition of "contact" and that the contact is repeated and unwanted. ORS 30.866(1)(a); ORS 163.730(3). " 'Repeated' means two or more times." ORS 163.730(7).

The remaining elements of ORS 30.866(1)—alarm or coercion and reasonable apprehension—have both subjective and objective components. The subjective component requires that the petitioner actually be alarmed or coerced by the contacts and that the contacts actually cause the petitioner reasonable apprehension. *Weatherly v. Wilkie*, 169 Or App 257, 259, 8 P3d 251 (2000). The objective component requires the alarm or coercion and the apprehension regarding the petitioner's personal safety to be objectively reasonable. *Id.* "Alarm" means "to cause apprehension or fear resulting from the perception of danger." ORS 163.730(1). "Coerce" means "to restrain, compel or dominate by force or threat." ORS 163.730(2).

The Supreme Court has explained that, if a "contact" involves speech, Article I, section 8, of the Oregon Constitution requires proof that it is a threat. A threat "is a communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999). A threat does not include "the kind of hyperbole, rhetorical excesses,

and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee." *Id.* (internal quotation marks omitted). Although a "contact" based on speech must be a threat, speech communications that do not meet that standard, "nevertheless, are relevant context for * * * nonexpressive contacts." *Habrat v. Milligan,* 208 Or App 229, 237, 145 P3d 180 (2006).

As discussed above, each "contact," individually, must give rise to subjective and objectively reasonable alarm or coercion. In this case, the parties dispute whether there were two "contacts" that gave rise to objectively reasonable alarm. We conclude that, even assuming that the "slugging" incident was one qualifying "contact" under ORS 30.866, no other incident in the record meets the statutory standard. Because two "contacts" are required, we reverse.

First, we turn to respondent's name calling and his statement that "[y]ou should be afraid of me, they're not going to stop me, I can do whatever I want." On this record, we understand that respondent's reference to "they" referred to the store's management and his reference to "whatever I want" referred to his practice of monopolizing the new books and putting them into his carts. Thus, respondent's statement and his name calling do not meet the *Rangel* standard for speech-based contacts. *See, e.g., Swarringim v. Olson,* 234 Or App 309, 314-15, 227 P3d 818 (2010) (the respondent's threats to have someone beat up the petitioner's son and slit his throat and his cursing at the petitioner's nine-year-old daughter while she walked to school were insufficient to meet the *Rangel* standard). Thus, none of respondent's statements is a "contact."

The only remaining source for a second "contact" is respondent's aggressive shopping behavior. Respondent pushed petitioner approximately 10 times over the course of two years while both parties were shopping, and he followed her from bin to bin in an effort to prevent her from finding valuable books. That behavior did not provide a basis for objectively reasonable "apprehension or fear resulting from the perception of danger." ORS 163.730(1) (defining "alarm"). We understand "danger," as used in ORS 163.730(1), to refer

to a threat of physical injury, not merely a threat of annoyance or harassment. *See Webster's Third New Int'l Dictionary* 573 (unabridged ed 2002) (defining "danger" as "the state of being exposed to harm : liability to injury, pain, or loss"). As a result, the record reveals, at most, one "contact."

Reversed.