Argued and submitted December 15, 2011, reversed May 16, 2012

Jennifer Lee BRAUDE,
*Petitioner-Respondent,*

*v.*

Karla Prescott BRAUDE,
*Respondent-Appellant.*

Deschutes County Circuit Court
10ST0043MA; A146463 (Control)

Jennifer Lee BRAUDE,
*Petitioner-Respondent,*

*v.*

Evan Paul BRAUDE
and Karla Prescott Braude,
*Respondents-Appellants.*

Deschutes County Circuit Court
10ST0044MA; A146464

279 P3d 290

Philip F. Schuster, II, argued the cause and filed the reply brief for appellants. On the opening brief were Evan Paul Braude and Karla Prescott Braude, *pro se.*

Pete Meyers argued the cause and filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

## HADLOCK, J.

Respondents appeal the trial court's entry of two stalking protective orders (SPOs).[1] The sole issue on appeal is the sufficiency of the evidence supporting those orders. Because this is not an "exceptional case" justifying *de novo* review, we review the trial court's factual findings for "any evidence" and its legal conclusions for errors of law. *See Travis v. Strubel*, 238 Or App 254, 256, 242 P3d 690 (2010) (explaining standard of review applicable to SPO appeals); ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases."). Applying that standard of review, we conclude that the evidence is insufficient to support the entry of an SPO against either respondent. Accordingly, we reverse.

Petitioner and respondent Evan Braude married in the early 1990s and have two children together, a son and a daughter. The couple separated in the fall of 2004 and, following acrimonious divorce proceedings, a judgment dissolving their marriage was entered in 2007. Evan married respondent Karla Braude roughly a year later. Shortly thereafter, he moved to modify the judgment that had dissolved his marriage to petitioner. One hearing in the ongoing modification proceedings was held on May 10, 2010. Petitioner filed civil stalking complaints against respondents the next day.

At a July 2010 hearing on petitioner's request for permanent SPOs, petitioner accused Karla of having made inappropriate inquiries into petitioner's accounts at a bank and a gas company, of having contacted the children's school in violation of petitioner's custody agreement with Evan, and of having walked past petitioner in the parking lot of the tile

---

[1] In civil stalking proceedings, the party applying for relief is called the "petitioner" and the party against whom relief is sought is called the "respondent." As we previously have noted, "that nomenclature can be confusing in an appeal like this, where the 'respondent' below is the appellant, and the 'petitioner' below is the respondent." *Schiffner v. Banks*, 177 Or App 86, 88 n 1, 33 P3d 701 (2001). In accordance with our rule governing the designation of parties in briefs, ORAP 5.15, all references to "petitioner" in this opinion are to J. L. B. and all references to "respondents" are to Evan Braude and Karla Braude. Because they share the same last name, we sometimes refer to the individual respondents by their first names.

store where petitioner worked. Karla smiled at petitioner when they walked past each other in the store parking lot but did not otherwise communicate with petitioner on that occasion.[2]

Focusing on events that had occurred the previous year, petitioner also accused both respondents of having repeatedly driven by her rural home in a manner that caused her alarm. Respondents own two cars, a silver Audi with dark tinted windows and a Nissan Armada. On more than a dozen days between mid-August and mid-October 2009, one or the other of those cars was spotted in petitioner's neighborhood. Sometimes, one of the cars was being driven very slowly along the road in front of petitioner's house; on other days, one of respondents' cars stopped for a short time on the road near the entrance to petitioner's driveway, staying there for up to roughly 10 minutes. Those incidents generally occurred between 5:00 and 8:30 in the morning. Petitioner saw respondents' cars some of the times they were in her neighborhood; on other occasions, only her neighbors saw the cars. One of those neighbors, Kathleen Hendrix, testified that she saw one of respondents' cars pass by petitioner's home "over a dozen [times] easily, and it was very concerning." After one such incident, Hendrix saw that petitioner was "trembling" and "very, very upset." Another neighbor also observed a number of the incidents; she found them threatening because it appeared that someone was "trying to watch [petitioner]."

On September 18, 2009, following an e-mail exchange about disputed financial matters, petitioner sent Evan another e-mail stating, in part, "[I]f you and Karla continue to drive by and stop in front of my house everyday it will be considered threatening, menacing and or stalking, continuation of this behavior is a direct acknowledgement of yours and Karla's intent to threaten as well as stalk me." Karla testified that she drove by petitioner's house and photographed it once more, on October 19, 2009, although no evidence suggests that anybody saw her car in petitioner's neighborhood

---

[2] The record does not indicate on what date each of those events occurred, except that respondents visited petitioner's place of work in 2008.

on that date. Indeed, nobody reported seeing either of respondents' cars in petitioner's neighborhood again until May 2010, when both petitioner and her neighbor, Hendrix, claimed to have seen respondents' Audi driving slowly by petitioner's home early on the morning of May 1. Petitioner sought and obtained temporary SPOs against both respondents later that month.

At the July 2010 permanent-SPO hearing, respondents acknowledged that Karla repeatedly had driven by petitioner's home to gather evidence for use in the post-judgment modification proceedings in Evan's divorce case. Respondents believed that petitioner's boyfriend had been living with her—contrary to what petitioner had indicated in her Uniform Support Affidavit—and so, on the advice of Evan's attorney, Karla had sought to prove the boyfriend's residency by taking photographs that showed his car parked at petitioner's house early in the morning. As noted, Karla took the last of those pictures on October 19, 2009—about a month after petitioner had told Evan that respondents should stop driving by her residence. Both respondents asserted, however, that neither of them had driven by petitioner's house again after that date, disputing petitioner's claim that they had been in her neighborhood on May 1, 2010. Respondents also testified that Evan never had accompanied Karla on her photography trips and that he never had driven by petitioner's home to take photographs himself.[3]

Much of the evidence introduced at the July 2010 hearing related to whether the incidents involving respondents' cars caused petitioner reasonable alarm or apprehension regarding her safety. Undisputed evidence established that nobody who observed the incidents ever saw either of respondents' cars travel onto petitioner's property. Nobody saw either respondent get out of the cars, gesture toward petitioner's house, or attempt to speak with petitioner or with anybody else. In addition, nobody who saw the cars in petitioner's neighborhood could tell who was driving or riding in

---

[3] Evan acknowledged at the SPO hearing that he had waited in his vehicle at the end of petitioner's driveway on a handful of occasions when one of the children called him from petitioner's house, seeking a ride. Petitioner does not argue that any of those incidents constituted "contacts" that could justify entering an SPO against either respondent.

the cars, except on one occasion when petitioner identified Karla as the driver and sole occupant. Nonetheless, petitioner explained, she found the incidents alarming in light of Evan's past aggressive behavior.

At the SPO hearing, petitioner described two incidents in which Evan had behaved violently toward or around her. The first occurred soon after she and Evan separated in 2004, when Evan was living in an apartment in a separate building on the marital property and petitioner and the children were living in the main house. One day while petitioner and the couple's daughter were at home, Evan broke open a locked door to enter the house and then broke open the locked door to the master bathroom where the daughter—then 12 years old—was bathing. Although Evan did nothing to physically harm either petitioner or his daughter, he "rant[ed] and raved and went on" in a manner that "was very frightening" while he retrieved his business clothes from the bathroom closet.

Roughly two months later, the couple's daughter called petitioner from Evan's new apartment in tears, and petitioner could hear Evan swearing in the background. Petitioner testified that, when she arrived at the apartment to pick up her daughter, Evan told her to "get the F out of there" and then "physically grabbed" her, lifted her onto her toes, and then "tossed" her on the floor. Petitioner obtained a restraining order against Evan following that incident, which she later dismissed. In light of those past events, petitioner testified, she felt frightened for her personal safety when respondents' cars were repeatedly spotted driving slowly past her home in 2009 and, she claimed, in May 2010.

The trial court concluded that the evidence was sufficient to support entry of permanent SPOs. First, the court determined that the only conduct by respondents that constituted "contacts" for purposes of entering the SPOs were "the contacts at the house, the coming to the house repeatedly early in the morning and parking."[4] The court specifically

---

[4] The trial court determined that other incidents, like Karla going to the store where petitioner worked, were "relevant to the entire situation" but did not constitute unwanted contacts on which an SPO could be based. Petitioner does not challenge that determination, with which we agree.

relied on the 13 photographs of petitioner's property that either Karla or Evan had taken, noting that those pictures corroborated the testimony of petitioner's neighbors and "end[ed] any speculation" as to whether repeated and unwanted contact had occurred.[5] Second, the court concluded that "there's enough in the history between the Petitioner and [Evan] for—to justify her concern and apprehension for her safety when she observes [respondents'] vehicle outside her home in a rural area repeatedly at very early hours in the morning over a period of at least months." The court therefore entered permanent SPOs against respondents.

On appeal, respondents argue that petitioner's evidence did not satisfy the requirements of ORS 30.866, under which the trial court entered the SPOs. That statute provides, in part:

"(1)   A person may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a person if:

"(a)   The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(b)   It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c)   The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

ORS 30.866.

That statute creates several requirements for entry of an SPO. First, a respondent's conduct must meet the statutory definition of "repeated and unwanted contact" with the petitioner or a member of the petitioner's immediate family or household. *Reitz v. Erazo*, 248 Or App 700, 705, 274 P3d 214 (2012). Second, the petitioner must subjectively—*i.e.*,

_____

[5] Although Karla testified that she took the photographs and Evan testified that he did not, the trial court found that "[i]t wasn't made clear who took all these photographs."

"actually"—"be alarmed or coerced by the contacts" and that alarm or coercion must be objectively reasonable. *Id.* Third, the contacts also must actually cause the petitioner apprehension about personal safety and that apprehension, too, must be objectively reasonable. *Id.* Finally, the respondent must have acted with the requisite mental state. *Osborne v. Fadden*, 225 Or App 431, 437, 201 P3d 278, *rev den*, 346 Or 213 (2009).[6]

In this case, the record does not support the trial court's determination that unwanted contacts caused petitioner *reasonable* apprehension for her personal safety. For purposes of reviewing the trial court's ruling, we assume (without deciding) that the record supports the court's implicit finding that each respondent intentionally, knowingly, or recklessly engaged in at least two unwanted contacts with petitioner in the two years before petitioner filed for the SPOs.[7] Moreover, we do not question the court's finding that the contacts caused petitioner genuine alarm. However, ORS 30.866(1) also requires that the contacts cause the petitioner objectively reasonable apprehension regarding her own personal safety or the safety of a member of her immediate family or household. *Falkenstein v. Falkenstein*, 236 Or App 445, 450, 236 P3d 798 (2010). We conclude that the contacts did not rise to that level in this case.

Respondents' behavior in driving by petitioner's house and photographing it, although unwelcome and unsettling to petitioner, did not itself evince any threat to petitioner's safety. Respondents did not enter petitioner's property during those incidents, did not make threatening gestures or comments (indeed, they did not attempt to communicate with petitioner or her neighbors in any way), and did not wait at the end of her driveway for lengthy periods of

---

[6] Article I, section 8, of the Oregon Constitution imposes an additional requirement in stalking cases in which the petitioner "seeks to rely on a contact that involves speech." *Falkenstein v. Falkenstein*, 236 Or App 445, 451, 236 P3d 798 (2010). "To avoid constitutional overbreadth problems, a contact that involves speech can serve as a predicate contact for an SPO only if it is a threat." *Id.* Petitioner does not allege that any of the contacts in this case involved speech or other expression.

[7] *See* ORS 30.866(6) (SPO actions "must be commenced within two years of the conduct giving rise to the claim").

time. *Cf. Habrat v. Milligan*, 208 Or App 229, 237-39, 145 P3d 180 (2006) (affirming entry of an SPO because, among other things, the respondent—who had made "persistent and inappropriate sexual overtures" to the petitioner— repeatedly parked directly in front of the petitioner's work place "for protracted periods of time," within her sight, and gave her "menacing glares"). Moreover, respondents were not strangers to petitioner; the parties all were acquainted and had ongoing dealings with each other—such as sorting out financial affairs and coordinating Evan's time with the children—that required them to communicate periodically. In addition, all but one of the incidents occurred during a roughly two-month period in the fall of 2009 that ended more than six months before petitioner filed for the SPOs. Those driveway incidents, standing alone, would not have caused a reasonable person in petitioner's position to feel apprehension for her personal safety in May 2010. *See Falkenstein*, 236 Or App at 452-53 (evidence that the respondent had waited outside the petitioner's house and had come over uninvited was insufficient to support an SPO because the contacts were not explicitly or implicitly threatening; "for example, there was no evidence that respondent made threatening gestures or movements towards petitioner or otherwise exhibited an intent to harm her"); *Sparks v. Deveny*, 221 Or App 283, 292-93, 189 P3d 1268 (2008) (the respondent's continued attendance at an exercise class that the petitioner attended, even after she told him to stop, would not cause a reasonable person apprehension because there was "no evidence that respondent behaved in a way during the class that would have given rise to concerns for 'personal safety' ").

Nor do the driveway incidents become objectively threatening when considered in the context of Evan's earlier violent acts. We recognize that conduct that might appear benign when viewed in isolation can take on a different character when viewed either in combination with or against the backdrop of one party's aggressive behavior toward the other. *Boyd v. Essin*, 170 Or App 509, 518, 12 P3d 1003 (2000), *rev den*, 331 Or 674 (2001). In this case, however, the parties' past relationship was not so characterized by violence or abuse as to make the more recent contacts objectively threatening. Rather, Evan's past aggression toward petitioner

involved only two isolated incidents that occurred almost five years before petitioner sought the SPOs, at the end of a long-term marriage that did not (as far as the record reveals) involve other abuse. This case is not similar to others, like *Boyd*, in which we held that present contacts caused an SPO petitioner objectively reasonable apprehension in light of the respondent's long-standing "history of violent and abusive behavior." 170 Or App at 518. Because the record does not support a determination that the driveway incidents would have caused a reasonable person in petitioner's position to feel apprehension for her personal safety, the trial court erred when it entered the SPOs.

Reversed.