Argued and submitted March 6, reversed December 3, 2014

Katherin Elizabeth ALLEN,
*Petitioner-Respondent,*

*v.*

Michael Lee HALVORSON,
*Respondent-Appellant.*

Washington County Circuit Court
C122290CV; A151539

341 P3d 120

Emilia Gardner, C. Michael Arnold, and Arnold Law Office, LLC, filed the brief for appellant.

David J. Celuch argued the cause and filed the brief for respondent.

Before Duncan, Presiding Judge, and Hadlock, Judge, and Lagesen, Judge.*

HADLOCK, J.

---

\* Hadlock J., *vice* Wollheim, J.

## HADLOCK, J.

Respondent appeals the entry of a stalking protective order (SPO), contending that the evidence was insufficient to support it. We agree with respondent and therefore reverse.

Respondent requests that we review the record *de novo*. *See* ORS 19.415(3) (the Court of Appeals may, in our sole discretion, review an equitable case *de novo*). However, because we do not consider this an "exceptional case," we deny that request. *See* ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases."). "Therefore, we review the facts for any evidence and the legal conclusions based on those facts for errors of law." *Langford v. Langford*, 262 Or App 409, 410, 324 P3d 623 (2014) (internal quotation marks omitted).

ORS 30.866 governs when a court may issue a stalking protective order:

"(1)   A person may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a person if:

"(a)   The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(b)   It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c)   The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

The trial court determined that the requisite number of unwanted and alarming contacts had occurred and that the repeated and unwanted contact caused petitioner objectively reasonable apprehension regarding her personal safety. In accordance with the standard of review described above, we summarize the evidence in the record that is relevant to those issues.

Petitioner's marriage to respondent ended in divorce in 2009.[1] Petitioner married Allen sometime thereafter. Petitioner sought an SPO against respondent on April 13, 2012. Despite evidence of a somewhat more extensive history of contacts between the parties, both sides agree that only three incidents occurred during the pertinent time period that could serve as a basis for concluding that respondent engaged in "repeated and unwanted contact." *See* ORS 30.866(6) ("An action under this section must be commenced within two years of the conduct giving rise to the claim.").

The first encounter occurred in either June or July of 2011. Petitioner testified that she was in her backyard when she observed respondent driving towards the cul-de-sac at the end of her street. Petitioner saw respondent slowly making a turn around the cul-de-sac and "weaving again." She stated that respondent was driving through the neighborhood for "intimidation purposes."

The second incident occurred on January 22, 2012. Allen was returning to the home he shared with petitioner when he observed respondent getting into a car that was parked in a neighbor's driveway. Allen pulled up in his truck and rolled down his window. Respondent's wife was in the car with respondent; she turned around and smiled at Allen. Allen testified that he tried to get their attention so that he could talk to them, but that they "basically ignored that, and drove off."

The last incident occurred on April 3, 2012, 10 days before petitioner sought the SPO. Petitioner and Allen were in their home when Allen spotted respondent's car in their next-door neighbor's driveway. Allen did not initially see respondent. He went upstairs, got his camera, and took a photo of respondent's car. Allen then went to another window and observed respondent talking with a neighbor other than the one whose driveway he had parked in. Allen then went back downstairs, stepped outside, and approached

---

[1] As per our usual practice in SPO cases, our identification of the parties refers to their status before the trial court. That is, despite that the "petitioner" before the trial court is now the "respondent" on appeal, we use the party identifications that applied below. *See* ORAP 5.15; *Schiffner v. Banks*, 177 Or App 86, 88 n 1, 33 P3d 701 (2001).

respondent's car to take a photograph of the car and its license plate. At that point, respondent, who was by then speaking with yet another neighbor across the cul-de-sac, observed Allen approaching his car. Respondent came over to Allen and asked Allen what he was doing. Allen replied that he was photographing the car, that he was tired of respondent doing "drive-bys," and that he was going to document "what you're doing here."

That led to a verbal exchange during which Allen asked respondent what he was doing there. Respondent, who had previously lived in the neighborhood, stated that he was there to see a friend. Allen apparently took that to mean the next-door neighbor, Bob, whose driveway respondent had parked in. Allen told him that Bob was not there, and stated to respondent, "Well, if you're such good friends with Bob, where is he?" Respondent replied, accurately, that Bob was in Lake Havasu, Arizona. Allen then asked respondent what he was doing there if he knew that Bob was not at home. Respondent replied, that he could do "anything, any time, anywhere." Respondent then got in his car, but the discussion continued. Allen testified that respondent "escalate[d] the foul language, and things like that, calling me names, and then drove off." Allen then went inside and told petitioner what had happened.

Not more than three or four minutes after that, Allen saw that respondent's car was back in the neighbor's driveway. Respondent was outside the car talking on a cell phone, an observation that Allen relayed to petitioner. Allen then saw petitioner's son, M, drive into the cul-de-sac "very fast."[2] M stopped his car and got out. Feeling that "something was going to escalate, something was going to happen where we needed police presence," Allen told petitioner to call the police. In talking with the officers who responded, Allen learned that respondent had called them first. Allen told the officers that, although he had not felt threatened when respondent first appeared that day, he had felt threatened when respondent returned. After talking with Allen and respondent, the officers left, followed "within seconds" by respondent and M.

---

[2] M is the son of petitioner and respondent.

On the basis of those contacts, the trial court entered the SPO against respondent. Several statutory requirements must be met for the trial court to enter an SPO under ORS 30.866, quoted above:

> "First, a respondent's conduct must meet the statutory definition of 'repeated and unwanted contact' with the petitioner or a member of the petitioner's immediate family or household. Second, the petitioner must subjectively—*i.e.*, 'actually'—'be alarmed or coerced by the contacts' and that alarm or coercion must be objectively reasonable. Third, the contacts also must actually cause the petitioner apprehension about personal safety and that apprehension, too, must be objectively reasonable. Finally, the respondent must have acted with the requisite mental state."

*Braude v. Braude*, 250 Or App 122, 128-29, 279 P3d 290 (2012) (footnote and internal citations omitted). Respondent challenges the sufficiency of the evidence with respect to many of those requirements. He asserts that the evidence failed to show a sufficient number of repeated and unwanted contacts with the petitioner or the petitioner's immediate family or household, *see* ORS 163.730(7) ("'Repeated' means two or more times."); that the record does not include evidence showing that he acted with the requisite mental state, *see* ORS 30.866(1)(a); and that any "apprehension" petitioner felt was not objectively reasonable, *see* ORS 30.866(1)(c).

We address only the last of those contentions, as it is dispositive. For the reasons set out below, we conclude that any apprehension felt by petitioner—either about her own personal safety or that of a member of her "immediate family or household"—was not objectively reasonable under the circumstances.[3]

In assessing the reasonableness of a person's apprehension, we examine the cumulative effect of the relevant

---

[3] Accordingly, we need not decide whether respondent engaged in a sufficient number of contacts with petitioner or a member of petitioner's "immediate family or household," whether respondent acted with the requisite mental state, or whether the contacts involved "speech" in a way that implicates the additional proof requirements set forth in *State v. Rangel*, 328 Or 294, 977 P2d 379 (1999). Even if we resolved each of those issues in petitioner's favor, we would still conclude that petitioner did not experience objectively reasonable apprehension for her personal safety or that of a member of her family or household.

unwanted contacts on that person. *Christensen v. Carter/ Bosket*, 261 Or App 133, 139-40, 323 P3d 348 (2014).

Beginning with the contact in the summer of 2011, the evidence showed only that respondent drove down petitioner's street; the record includes no evidence suggesting that respondent lingered in the area or even looked in petitioner's direction. Objectively, the episode was brief and innocuous.

The same is true of the January 2012 contact (no others having occurred in the intervening five or six months). The evidence establishes that, when approached by Allen in a neighbor's driveway, respondent ignored Allen and drove away. Leaving aside the lack of evidence suggesting that petitioner was ever informed of that incident, it was not the sort of encounter that would leave a person in reasonable apprehension over anybody's "personal safety."

Those incidents color the events that occurred on April 3, 2012, four months later. Although respondent actually spoke with a member of petitioner's household that day (he had not on the previous occasions), he did so only after Allen came outside and began photographing respondent's car. Up until that point, respondent had merely parked nearby and conversed with two neighbors, but had not, so far as the record reveals, manifested any interest in petitioner or Allen. After Allen and respondent exchanged words— during which respondent "escalate[d] the foul language, and things like that"—respondent got in his car and drove away. He then returned to the neighbor's driveway, but did not approach petitioner's house. Instead, he remained in the driveway until the police arrived in response to his call. In assessing the reasonableness of any apprehension that petitioner felt, Allen's own role in that interaction cannot be ignored. Moreover, the record includes no evidence that respondent engaged in any violence or made any explicit or implicit threats that day. Although the April 3 incidents may not have been completely innocuous, the absence of any threatening language (as opposed to expressions of anger or use of profanity) strongly suggests that any apprehension that petitioner experienced was not objectively reasonable. *See Braude*, 250 Or App at 125, 129 (no reasonable

apprehension where the respondents repeatedly drove by the petitioner's house early in the morning, and parked outside the house for "up to roughly 10 minutes," photographed the house, but did not go on the property or make any threatening gestures or comments); *cf. Habrat v. Milligan*, 208 Or App 229, 237, 145 P3d 180 (2006) (affirming entry of an SPO, in part, because the respondent—who had made "persistent and inappropriate sexual overtures" towards petitioner— repeatedly parked in front of the petitioner's workplace "for protracted periods of time" and directed "menacing glares" at her); *Delgado v. Souders*, 334 Or 122, 125, 46 P3d 729 (2002) (evidence sufficient to show a reasonable apprehension regarding personal safety where a relative stranger persistently and surreptitiously followed the petitioner, and repeatedly appeared next to her, without warning, when she was alone).

In arguing to the contrary, petitioner points to evidence of contacts that occurred between the parties prior to the two years preceding the date when petitioner filed for the SPO. She does not argue—apparently in view of the two-year statutory window of ORS 30.866(6)—that any of those incidents could serve as an unwanted contact that could form a basis for the SPO. Instead, she argues that those earlier incidents provide important context for gauging the reasonableness of the apprehension that the more recent encounters created. *See Braude*, 250 Or App at 130 ("We recognize that conduct that might appear benign when viewed in isolation can take on a different character when viewed either in combination with or against the backdrop of one party's aggressive behavior toward the other.").

We summarize the evidence regarding the earlier incidents on which petitioner relies. In 2007, respondent "shoved [petitioner] on the sidewalk" following a soccer game. In 2009, respondent became "verbally belligerent" in the office of petitioner's divorce attorney. The attorney told respondent that he would call security if respondent did not leave; respondent left the attorney's office, waited for petitioner in the parking lot, and said "something" to her when she arrived back at her car. Also in 2009, respondent followed Allen's truck. After Allen pulled into a mall parking lot, respondent blocked the exit with his car and approached

Allen in "a threatening manner." Allen told respondent to stop following him; respondent got back in his car and continued following Allen until Allen picked up petitioner. In Allen's words, respondent "said some things to us, and then we left." The record also includes evidence that respondent had, on occasion, demonstrated anger towards his son.

The evidence about those earlier incidents does not alter our conclusion that respondent's recent unwanted contacts would not cause an objectively reasonable person to fear for her own personal safety or that of her family or household. Although that evidence shows that respondent has sometimes exhibited anger and aggression towards others, those relatively infrequent incidents were not so violent or intimidating—at least, as they are characterized in this record—to give respondent's more recent, nonthreatening conduct significantly more sinister implications. *Cf. id.* at 130 ("[T]he parties' past relationship was not so characterized by violence or abuse as to make the more recent contacts objectively threatening."); *Boyd v. Essin*, 170 Or App 509, 518, 12 P3d 1003 (2000), *rev den*, 331 Or 674 (2001) (objectively reasonable for the petitioner to be alarmed by contacts when the respondent had previously assaulted his son, threatened the petitioner with a gun and a baseball bat, abused the petitioner, and threatened her "many times" in private). Put differently, the recent contacts—even when viewed in light of respondent's earlier outbursts and a single incident of physical aggression that occurred several years ago—would not cause a person objectively reasonable apprehension about either her "personal safety" or that of Allen, as ORS 30.866(1)(c) requires.

Petitioner may well have been annoyed or disquieted at seeing respondent in her neighborhood, and understandably so. However, any apprehension that petitioner had for her own, or Allen's, personal safety was not objectively reasonable under the circumstances.

Reversed.