Argued and submitted May 5, affirmed November 16, 2016, petition for review denied April 27, 2017 (361 Or 439)

Jami DAVES,
*Petitioner-Respondent,*

*v.*

Shahrohk KOHAN,
*Respondent-Appellant.*

Lane County Circuit Court
15SK00445; A159550

385 P3d 1161

George W. Kelly argued the cause and filed the brief for appellant.

No appearance for respondent Jami Daves.

Before Ortega, Presiding Judge, and Lagesen, Judge, and Garrett, Judge.

## ORTEGA, P. J.

Respondent appeals a judgment granting petitioner's request for a permanent stalking protective order (SPO) against him under ORS 30.866(1),[1] raising two assignments of error.[2] In his first assignment, respondent contends that the trial court erred by determining that petitioner experienced "reasonable apprehension" regarding her "personal safety." In his second assignment, respondent argues that the court erred by denying him the right to cross-examination and by refusing to allow him to call two of his witnesses. On the latter point, we conclude that the trial court's management of the proceedings was within its allowable discretion and, on the merits, that petitioner made the necessary showing of reasonable apprehension regarding her personal safety. Accordingly, we affirm.

Respondent has not requested *de novo* review, and we find no reason to exercise our discretion to apply such review. ORAP 5.40(8)(c); ORS 19.415(3)(b). Accordingly, we review the trial court's factual findings for "any evidence" and the court's legal conclusions for errors of law. *King v. W. T. F.*, 276 Or App 533, 537, 369 P3d 1181 (2016). Further, we review the court's exercise of control over the presentation of evidence and the examination of witnesses for abuse of discretion. *See Howell-Hooyman and Hooyman*, 113 Or App 548, 550, 833 P2d 328 (1992) (reviewing trial court's decision to end trial before husband completed cross-examination of witness and before presentation of his case-in-chief for abuse of discretion).

---

[1] ORS 30.866(1) provides:

"A person may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a person if:

"(a) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that persons' immediate family or household thereby alarming or coercing the other person;

"(b) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

[2] We refer to the parties by their designation in the trial court. *King v. W. T. F.*, 276 Or App 533, 534 n 1, 369 P3d 1181 (2016).

Respondent, a horse trainer, owns property in Creswell that consists of a house, a recreational vehicle (RV), and a horse arena. At the time of the incidents in question, petitioner and her husband, who own rescue horses, rented the house from respondent, and respondent lived in the RV. They had shared use of the horse arena. Over time, the relationship between the parties became contentious and eventually they obtained temporary SPOs against each other (petitioner against respondent and respondent against petitioner's husband).[3] The court held a hearing to determine whether to issue permanent SPOs.

At the outset of that hearing, the parties, all appearing without counsel, told the trial court that they had three witnesses each.[4] The court then swore in petitioner, petitioner's husband, and respondent as witnesses, and stated, "I'm going to give everyone here the opportunity to tell me what it is they understand happened." The court further stated:

> "I'll make an assessment about whether I find it credible or not. If I don't find it credible, then the testimony will be weighted lightly. If I do find it credible, then it may be weighted heavily and I'll make a decision based on that testimony.
>
> "If during the course of this hearing, I find that it's not possible for me to determine credibility or lack of credibility based on everyone's testimony, I will continue the hearing to let you bring in other witnesses."

Having explained its approach, the trial court allowed the parties to testify about their respective versions of events.

Petitioner testified first and stated that the first unwanted contact with respondent occurred on January 20, 2015, while she was training her horse in the arena. She testified that respondent came up behind her, pushed himself against her, asserted that she needed to "relieve some tension," and started massaging her shoulders. According to

---

[3] This appeal concerns only the permanent SPO by petitioner against respondent.

[4] Respondent's intended witnesses were his girlfriend, one of his horse training clients, and a contractor who did repairs to his rental house. Petitioner's intended witnesses were not actually present during the hearing.

petitioner, she left the horse arena "bawling" and later told her husband that she wanted to move out of the house they were renting from respondent.[5]

As to the second incident, petitioner testified that it occurred at around 7:00 p.m. on either April 10 or 11, 2015. Petitioner stated that she was taking a bath at home when she saw respondent peering into her window. According to petitioner, she "screamed bloody murder" when she realized that respondent was watching her. She testified that, after hearing her scream, her husband "flew out" of the side door of the house and "chased [respondent] halfway down to his trailer."[6]

Once petitioner had presented her version of events, the court called on respondent to testify about why he was seeking an SPO against petitioner's husband and told him that he could respond to petitioner's testimony. Respondent began by stating that petitioner's testimony was a "complete fabrication of lies" and that he had proof of his whereabouts on the property "on the said dates and times." He then testified about the incidents that led him to seek an SPO against petitioner and her husband, and the court called the contractor as a witness to testify about alleged contacts that are not at issue in this appeal. The court then redirected respondent's testimony to the incidents petitioner had testified about, beginning with the bathroom incident. The court asked respondent if there was an incident "some time in the evening, some time in the middle of April or thereabouts" where petitioner's husband walked out of the house and shouted at him not to come back to their home. Respondent claimed, specifically, that on April 10, between 6:45 p.m. and 8:30 p.m., he was in his RV with his girlfriend and that his girlfriend could corroborate that fact. The court and respondent then had the following colloquy:

---

[5] Specifically, petitioner testified:

"When my husband got home, I told him what had happened. I said I was leaving, that was it. My husband told [respondent] you do not come here again, we are moving out. [Respondent] said if we moved out, that he would sue us for breach of lease."

[6] Petitioner's husband later testified that respondent had moved a "big round table" "over to the bathroom window and was on that looking at [petitioner] in the window in the bath."

"The Court: All right. Okay. So are you saying that there was never an incident in the evening on a day sometime in the middle of April in which—

"[Respondent]: No. None, Your honor.

"The Court: You don't—all right. In which [petitioner's husband] is shouting at you not to come back?

"[Respondent]: Nothing, Your honor."

The court then inquired about the horse arena incident, asking respondent whether he had ever helped petitioner "get on to a horse or ride a horse or anything." Respondent stated, "Not at all," and summarized his version of events as follows:

"I have in *two instances* and *one of them* with one of my clients, we were watching as they were finishing up because we were going to go in after them. Because I was training my client with her horse.

"So it was a brief standing there outside of the arena watching her and three other—four other people that were working with those horses. So they were doing their thing, we were just watching. I at no point had I ever had any contact with [petitioner] or any horse that she was working with."

(Emphases added.)

The court then asked petitioner to reply to respondent's testimony. Petitioner acknowledged that respondent was correct about the particular occasion he had testified about but clarified that the horse arena incident that she had testified about referred to a separate incident that had occurred on a different day. Petitioner then stated that, although respondent had not "physically harmed" her, he had harmed her "mentally." She indicated that she had "gotten rid of all [her] horses and moved out of the county to be away from [respondent]."

After petitioner and respondent finished testifying, the court asked, "Anything else that anyone wants—was there any other testimony you wanted me to be aware of?" Respondent then alerted the court that his girlfriend and a current client were present in court and indicated that his client would testify about an incident related to petitioner's

husband. The court found that that incident was not in dispute and then asked respondent, "Were your witnesses going to testify about anything else? Did you have any other witnesses?" Respondent suggested that his girlfriend would testify about another incident related to petitioner's husband. The court asked again, "Anything else? Any other testimony? Any other evidence you want me to know?" Respondent made an additional statement regarding an incident unrelated to this appeal. Finally, the court asked, "Anything else?" To which respondent answered, "No, Your honor."

At the end of the hearing, the court stated that, because the parties' testimony was "diametrically opposed," it would rely on credibility findings. The court then found petitioner to be more credible and concluded that the two contacts she testified about were more likely than not to be true. Having determined that "there were at least two unwanted contacts as contemplated under the statute," the court kept the SPO against respondent in place. In its final order, the court expressly concluded that "it was reasonable for [p]etitioner to be alarmed or coerced by [respondent's] contact," and that it was also "objectively reasonable for a person in [p]etitioner's situation to have been alarmed." It further concluded that "[r]espondent's repeated and unwanted contact caused the [p]etitioner reasonable apprehension regarding [her] own personal safety."[7]

We begin with respondent's second assignment of error, addressing his claim that the SPO hearing was "fundamentally unfair." A "trial court, in the exercise of sound discretion, has the authority reasonably to control the presentation of evidence and the examination of witnesses." *Howell-Hooyman*, 113 Or App at 551 (relying on OEC 611(1)).[8]

---

[7] The court ordered the SPO even though it was aware that petitioner and her husband had moved away from respondent by the time of trial. Petitioner had testified, "I don't think he will ever find us again, but on the off side, we do do horse things together. We both are horse people, so I'm not sure in the event that, you know, I go to one of those there won't be an altercation."

[8] OEC 611(1) provides:

"The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to make the interrogation and presentation effective for the ascertainment of the truth, avoid needless consumption of time and protect witnesses from harassment or undue embarrassment."

It may be permissible for a court to limit the presentation of evidence or cross-examination of witnesses if it determines that the evidence is or would be "irrelevant or redundant." *Id.* However, although "a trial court has some discretion to control cross-examination, *** it does not have the power wholly to deny the right to cross-examine. To deny that right is legal error." *Johnson v. Captain*, 281 Or App 360, 364, 384 P3d 532 (2016) (internal quotation marks and citation omitted).

Here, respondent contends that the SPO hearing was unfair because the court did not allow him to call his girlfriend and client as witnesses and because the court conducted the hearing "so as to deny parties the right to cross-examine." He contends that, had his girlfriend and client been allowed to testify, they would have supported his claim that petitioner's "story" was a "complete fabrication of lies." In particular, he states that his girlfriend's testimony would have allowed him to demonstrate that, on April 10, at 7:00 p.m., he was in his RV surfing the internet. As to his client, he contends that her testimony would have allowed him to prove that he "did nothing more than observe respondent" at the horse arena. Finally, he argues that the court should have allowed him the right to cross-examination because that "frequently allows a party to show where an adverse witness has exaggerated, given a false impression, or lied." Petitioner does not appear on appeal.

At the outset, we decline to consider respondent's challenge regarding cross-examination, because it is unpreserved and petitioner does not request plain error review. *See Ailes v. Portland Meadows, Inc.*, 312 Or 376, 380-81, 823 P2d 956 (1991). Respondent did not ask to cross-examine any witnesses, and the court did not expressly deny him that opportunity—that is, it is not clear to us that the court, through its conduct, "communicated" such a denial. *See Bryant v. Walker*, 190 Or App 253, 257-59, 78 P3d 148 (2003), *rev dismissed*, 337 Or 585 (2004) (declining to address a respondent's claim that the court erred by not allowing him to cross-examine the petitioner under similar circumstances). The circumstances in this case are distinguishable from those in *Johnson*, 281 Or App at 367, where we concluded that the court committed plain error by not allowing

cross-examination. The court in that case "explicitly told respondent that he was not allowed to ask questions of petitioner," and the "questions respondent did raise regarding petitioner's testimony were never posed to petitioner, either directly or through the trial court." *Id.* Here, the court did not make such an explicit denial, nor is it apparent from our reading of the record that respondent raised questions about any of the witnesses' testimony.

The court likewise did not abuse its discretion by declining to allow respondent's girlfriend and client to testify. It is evident from the record that the court determined that the probative value of that proposed testimony, if any, was substantially outweighed by considerations of delay and needless presentation of evidence. *See* OEC 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by * * * considerations of undue delay or needless presentation of cumulative evidence."). For instance, petitioner testified, and the court found, that the bathroom incident had occurred either on April 10 or 11; thus, testimony by respondent's girlfriend about his whereabouts specifically on April 10, in the absence of similar testimony about his whereabouts on April 11, would not have been particularly probative of whether the bathroom incident had, in fact, occurred and, in particular, would not have tended to undercut petitioner's version of events in any meaningful way. Similarly, the probative value of the client's testimony was also minimal because the matter that she intended to testify about was not in dispute. Thus, on this record, it was not an abuse of discretion for the court not to call those witnesses.

Having concluded that the trial court did not deprive respondent from a fair hearing, we next address whether the court erred in granting the SPO against respondent. Because respondent challenges the sufficiency of the evidence supporting the SPO, we view "the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the trial court's disposition and assesses whether, when so viewed, the record is legally sufficient to permit that outcome." *King*, 276 Or App at 537 (internal quotation marks omitted). Whether the evidence presented

was sufficient is a legal question. *Delgado v. Souders*, 334 Or 122, 134, 46 P3d 729 (2002).

We note that, to obtain an SPO under ORS 30.866(1), "a petitioner must prove, by a preponderance of the evidence, that each requirement of that statute has been met." *King*, 276 Or App at 538. *First*, a petitioner must "demonstrate that there were two or more unwanted contacts with either the petitioner or a member of the petitioner's immediate family within the previous two years." *Id.* (internal quotation marks omitted). *Second*, a petitioner must show that she was "subjectively alarmed or coerced by each contact and that the alarm or coercion was objectively reasonable for a person in the victim's situation." *Id.* (internal quotation marks omitted). In the SPO context, "alarm" means "to cause apprehension or fear resulting from the perception of danger." ORS 163.730(1) (defining "alarm"). "Danger" refers to "a threat of physical injury, [and] not merely a threat of annoyance or harassment." *King*, 276 Or App at 538 (internal quotation marks omitted; brackets in original). *Third*, "the contacts, cumulatively, [also] must give rise to subjective apprehension regarding the petitioner's personal safety or the personal safety of a member of the petitioner's immediate family or household, and that apprehension must be objectively reasonable." *Id.* (internal quotation marks omitted; brackets in original). "To determine whether a petitioner's apprehension is objectively reasonable, we consider all of the circumstances of the parties' relationship." *Id.* (internal quotation marks omitted). Further, "conduct that might appear benign when viewed in isolation can take on a different character when viewed either in combination with or against the backdrop of one party's aggressive behavior toward the other." *Braude v. Braude*, 250 Or App 122, 130, 279 P3d 290 (2012).

In challenging the court's granting of the SPO, respondent contends that "the court erred in finding that respondent had experienced 'reasonable apprehension' regarding her 'personal safety.'" In developing his argument, respondent claims that there was no evidence that petitioner was "alarmed" by respondent's conduct. According to respondent, "the evidence makes plain that, after the

unwanted contacts had occurred, [petitioner and her husband] did not phone police, did not flee their home, and were even found laughing when accused of unplugging [respondent's] power cord." We understand respondent to argue that the court erred by concluding that petitioner was subjectively and objectively alarmed by the unwanted contacts and that she experienced apprehension for her personal safety. Thus, in considering respondent's first assignment of error, we address each of those determinations.

We begin by addressing whether petitioner was subjectively alarmed by the unwanted contacts and whether it was objectively reasonable for a person in petitioner's situation to experience such alarm.[9] As to the first unwanted contact, we conclude that the trial court could determine that petitioner experienced subjective and objective alarm. Respondent engaged in unwanted physical contact with petitioner by pushing up against her from behind and massaging her shoulders. In response, petitioner left the horse arena "bawling" and testified that she wanted to move away from the home she rented from respondent. The court could have reasonably inferred from that evidence that petitioner was subjectively—that is, actually—alarmed. Furthermore, that evidence was also sufficient for the court to conclude that petitioner's alarm was objectively reasonable, because a person in petitioner's situation likely would have experienced apprehension of physical injury in the form of a sexual assault, given the physical and sexually suggestive nature of respondent's unwanted contact. *See Delgado*, 334 Or at 125, 136-37 (plaintiff's alarm was objectively reasonable where the defendant had "'silently and swiftly' walked up behind her, without announcing—or without her otherwise noticing—his presence[,]" and where the plaintiff was "concerned by the physically close nature of [the] defendant's appearances, at times when no other people were nearby").

As to the second incident, we also conclude that the trial court could determine that petitioner experienced

---

[9] We note that a determination that a person was subjectively alarmed is a finding of fact, reviewed for any evidence, whereas a determination that a person was objectively alarmed is a legal conclusion, reviewed for legal error. *See King*, 276 Or App at 537 (reviewing the trial court's factual findings for "any evidence" and the court's legal conclusions for errors of law).

subjective and objective alarm when respondent peered through her bathroom window while she was bathing. The fact that petitioner "screamed bloody murder" in response to the unwanted contact supports an inference that she experienced apprehension for her safety, especially when considering that the contact occurred when she was undressed and alone in the very private space of her bathroom. The court could have inferred from those circumstances that respondent's conduct was actually threatening to petitioner, not merely "unsettling, unusual, or unpleasant." *See King,* 276 Or App at 540 (internal quotation marks omitted). That inference is further supported by the fact that petitioner's reaction elicited her husband's intervention and resulted in her husband having to chase respondent away from their home. For those same reasons, the court could also have concluded that petitioner's alarm was objectively reasonable, because a person in petitioner's situation would have experienced apprehension for his or her personal safety. *See Habrat v. Milligan,* 208 Or App 229, 239, 145 P3d 180 (2006) (petitioner was objectively alarmed despite the absence of "overt threats" where respondent had, among other things, "obsessively directed unwanted attention to petitioner" and where other people had taken steps to protect petitioner).

We next consider whether those contacts, cumulatively, were sufficient to support the court's determination that petitioner suffered actual and reasonable apprehension regarding her personal safety. We conclude that they were. Although the record does not contain evidence that respondent had a history of threats or violence, that alone is not dispositive. *See Delgado,* 334 Or at 136-37 (affirming an SPO where the record did not indicate that the respondent had a history of violence). A court may consider all of the evidence in combination, including the relationship between the parties, to determine whether a petitioner suffered actual and reasonable apprehension regarding her personal safety. Here, given that respondent was petitioner's landlord, respondent's repeated unwanted contacts with petitioner are particularly troubling, especially in light of their apparent sexual nature. In addition, it appears that respondent was aware that his initial unwanted and physical contact with petitioner had caused her to want to move

away, yet he engaged in a further incident of unwanted contact. Respondent's willingness to continue to engage in such behavior, combined with the physical and sexually suggestive nature of his contacts, supports the court's conclusion that petitioner's apprehension for her personal safety was subjectively and objectively reasonable. Thus, the trial court could conclude, based on a preponderance of the evidence, that petitioner experienced "reasonable apprehension" regarding her "personal safety" as a result of respondent's contacts.

Affirmed.