Argued and submitted May 9, 2019, affirmed July 8, 2020

C. Q. R.,
*Petitioner-Respondent,*

*v.*

Phillip Wekesa WAFULA,
*Respondent-Appellant.*

Multnomah County Circuit Court
15SK01817; A161470

471 P3d 786

Petitioner obtained a permanent stalking protective order (SPO) under ORS 30.866(1). Respondent appeals, challenging the sufficiency of the evidence for an SPO. Petitioner and respondent met when respondent followed petitioner into a coffee shop and asked her on a date, which petitioner declined, telling him that she was in a relationship and not interested. Thereafter, respondent—who, unbeknownst to petitioner, worked in the same building where petitioner took classes—initiated contact with petitioner on several occasions over a period of months. Among those contacts, respondent concedes that there was one qualifying contact for SPO purposes, specifically an incident in which respondent approached petitioner in a bagel shop, told her that he had been watching her a week earlier at a nightclub, and grabbed her upper thigh. However, respondent contests the sufficiency of the evidence to establish a second qualifying contact. *Held*: The trial court did not err. Although it is a close case, there was sufficient evidence to establish a second qualifying contact for SPO purposes, specifically an incident in which respondent pushed between petitioner and her walking companion and grabbed her around the waist. Under the specific circumstances and in light of their prior interactions, petitioner's alarm and subjective apprehension about her personal safety were objectively reasonable, and there was sufficient evidence to allow a finding that defendant's conduct was at least reckless.

Affirmed.

Angel Lopez, Judge.

Kenneth E. Kahn II argued the cause and filed the briefs for appellant.

Ivan Resendiz Gutierrez argued the cause for respondent. On the brief were Cody J. Elliott, Sanja Muranovic, and Miller Nash Graham & Dunn LLP.

Before DeHoog, Presiding Judge, and Egan, Chief Judge, and Aoyagi, Judge.*

_____

\* Egan, C. J., *vice* Hadlock, J. pro tempore.

AOYAGI, J.

Affirmed.

**AOYAGI, J.**

Petitioner obtained a permanent stalking protective order (SPO) after respondent initiated a series of contacts with her over several months. Respondent appeals the SPO judgment, challenging the sufficiency of the evidence, and a supplemental judgment for attorney fees. For the following reasons, we conclude that the trial court did not err in entering an SPO and therefore affirm the SPO judgment. We also affirm, without discussion, the supplemental judgment for attorney fees.

## FACTS

Respondent requests *de novo* review, but we are unpersuaded that this is an "exceptional case" warranting such review. *See* ORAP 5.40(8)(c) (making *de novo* review discretionary and providing for it "only in exceptional cases"). We therefore deny that request and instead "review the facts for any evidence and the legal conclusions based on those facts for legal error." *Miller v. Hoefer*, 269 Or App 218, 219, 344 P3d 121 (2015). Absent express findings, we presume that the trial court implicitly found disputed facts consistent with the outcome. *Id.* "When the sufficiency of the evidence supporting an SPO is challenged on appeal, we view the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record is legally sufficient to permit that outcome." *King v. W. T. F.*, 276 Or App 533, 537, 369 P3d 1181 (2016).

We state the facts accordingly. Except as otherwise noted, the facts generally come from petitioner's testimony.

Petitioner is a student at Portland State University (PSU), who, as a graduate student, began taking classes at a building in downtown Portland. Petitioner first encountered respondent, a stranger to her, in early June 2015 at a coffee shop on the PSU campus. Respondent turned as petitioner passed him on the street and followed her into the coffee shop. He entered as she was placing her order and approached her directly. Respondent "introduced himself as Philip and said that he had just seen [her] get off the MAX and felt like he needed to *** approach [her] and

talk to [her]." Petitioner said that it was nice to meet him and asked, because he had an accent, whether he was "from here." Respondent responded that he was from Africa. When petitioner said that she was from Sierra Leone, respondent told her that he was from Sierra Leone too (although he later testified that he is from Kenya). Respondent asked petitioner for her phone number and invited her on a date. Petitioner "told him no," that she "was not interested" and "was in a relationship," and left the coffee shop.

A little over a month later, in mid-July, petitioner was sitting in a bagel shop near the PSU campus, waiting for her order, when she saw respondent "kind of rush in and look around." (Unbeknownst to petitioner at the time, respondent worked in the same building where she had her PSU classes.) Respondent went straight up to petitioner and asked if she remembered him seeing her. Petitioner said she remembered him from the coffee shop. Respondent replied that "no, about a week ago [he] saw [her] at a nightclub." Respondent then described having seen petitioner at Church Bar, what she had been wearing, who she had been with, what dance steps she had done, and how many drinks she had had. Petitioner felt "very apprehensive that [respondent] was approaching [her] in this way." Petitioner asked him why he had not spoken to her at the nightclub. Taking a step toward her, respondent said, "like it was a joke," that it was "because he didn't want to seem creepy." Respondent then smiled and "put his hand on" or "grabbed" petitioner's upper thigh. Petitioner immediately stood, stepped back, and got her order and left.

Petitioner felt "very uncomfortable," "alarmed," and "extremely apprehensive" about the bagel-shop incident. She did not respond "aggressive[ly]" because she did not know respondent or his "triggers," but she believed that her body language made clear to him her discomfort. Petitioner called her mother about what had happened, and her mother told her to get respondent's name and number for "security" if she saw him again, so that petitioner's uncle and stepfather could tell respondent to leave her alone. According to petitioner's mother, petitioner was fearful about the situation

and, in both the Sierra Leone community and "African American culture," "that's what men do"; "the women don't take care of things like that."

Petitioner began having friends walk her to classes and to her car. She "constantly" saw respondent around the PSU campus, but their only actual interactions were those initiated by respondent. The next of those was in late August, about six weeks after the bagel-shop incident. Petitioner was at a nightclub in downtown Portland, which was hosting a private event attended by a famous football player. The private event was upstairs, with restricted access, and petitioner was there. Around 12:30 a.m., petitioner went outside the club to meet a friend. Outside, she saw respondent, who made eye contact and waved, trying to get her attention. Petitioner immediately turned away and went back inside and upstairs. She later saw respondent try to come upstairs, but he was turned away and remained downstairs in the unrestricted area; respondent testified that he had wanted to see the famous football player.

Around 2:30 a.m., petitioner left the club and walked to a friend's house. On her way, while petitioner and a friend were crossing a street, respondent pulled up in a white Mercedes and blocked their existing path of travel, although they could have walked around the car. Respondent rolled down his window, and, as petitioner's friend approached, respondent said that he was there for petitioner, not her, pointing at petitioner. According to respondent, he was on his typical route home from downtown when he saw petitioner and took it as "a sign"; he wanted to see if she would "respond to the car," because his car looks good and can "play an important role" in dating. Remembering her mother's instructions, petitioner "immediately asked [respondent] for his name and number," and respondent provided it. Petitioner asked respondent how he had found her, and he said that it was a coincidence. Respondent "was kind of doing that smile thing and it just made [her] feel *** very unsafe because it was only [her] and [her] friend." Petitioner asked respondent why he was there and said that it was weird that he was there. She then left with her friend, who described petitioner as "afraid" and "worried."

At that point, petitioner was concerned for her personal safety, because respondent "had already approached [her] several times after [she] told him [she] was uninterested on the initial encounter, because he had touched [her] in such an intimate place [her upper thigh] and made [her] feel unsafe for [her] personal space, and because [she] had already seen him walking past in the club earlier that night." Petitioner also had not seen respondent leave the club and did not expect to see him on the street.

After the August encounter, petitioner gave respondent's name and phone number to her uncle and stepfather, who called respondent, but respondent did not understand who they were talking about.

At some point in the weeks after the August encounter, respondent saw petitioner in the building where he works (and where petitioner takes classes). Petitioner turned and walked away from respondent "like she was frightened." Only respondent testified to that specific incident—and his perception that petitioner looked frightened—but petitioner testified more generally that she saw respondent "constantly" in the building.

In mid-September, petitioner and respondent had their next direct encounter. Petitioner had just left the building where she takes classes (and where respondent works) and was walking "shoulder to shoulder" with a companion. A person walking toward them "pushed through between [them]" and "grabbed [petitioner] around [her] waist." Petitioner realized that it was respondent, stopped walking, and "was very apprehensive and also very confused as to what was going on and trying to process everything." Respondent said something to petitioner and then kept walking. According to respondent, rudely walking past or between someone is a "practical joke that [he] do[es] with a lot of people." Usually people think it is rude but then laugh when they realize who it is, but petitioner stopped walking and "just kind of paused," which was a different reaction that made respondent think "whoa."

After the September incident, petitioner asked her uncle and stepfather to call respondent again to ask him to

leave her alone, because, "that was the second time that he had touched [her when she] did not want him to." Both petitioner's uncle and respondent testified about the calls. When the uncle called, respondent did not understand who he was talking about until the uncle mentioned the crosswalk encounter, at which point he realized that it was about petitioner. While respondent was on the phone with petitioner's uncle, petitioner's stepfather called. Respondent later told a coworker that people were "threaten[ing]" him and telling him they could find him from his phone number, prompting the coworker to tell respondent to call the police. According to respondent, he was angry with petitioner that she had given his phone number to her uncle and stepfather and was "spreading all these rumors" about him.

Over two months later, in early December, petitioner was with a friend at a deli in the building where she attends classes (and where respondent works) when respondent walked by, saw petitioner, and approached her. Respondent stood "very close" to petitioner and asked her to come outside with him. She kept saying no, but he was persistent and asked several times, growing agitated. Respondent told petitioner that he had filed a police report, tried to give her a card, told her that she needed to call the police to put her information on the report, and told her never to give his number to anyone to call him. Respondent was approaching petitioner as he spoke, while petitioner kept saying no and stepping back, until her friend stepped in front of petitioner and told respondent that he was being very aggressive and very hostile to a female and that he needed to back up and stop approaching. Petitioner then left the deli.

Petitioner was "so fearful at that point that [she] did not want to be at [the] building anymore." She inquired about taking her finals in a different building, and, at PSU's suggestion, filed a report with campus security. An officer subsequently called respondent and told him not to contact petitioner.

The next morning, petitioner went to the building to take her finals and saw respondent standing outside. She did not go inside and, 35 minutes later, a friend of petitioner's told her that respondent was still there, walking

around the lobby. Petitioner waited two hours and had campus security escort her to class. It is unclear exactly when petitioner learned that respondent worked in the building—whether it was the day before when she filed a report with campus security or sometime later—but an officer told her that fact and then "[i]t made more sense why [she] was constantly seeing him there, because [she] saw him a lot of times."

Petitioner petitioned for an SPO. The trial court granted a temporary order and then held a hearing on a permanent order. After hearing the evidence, the court granted the permanent SPO. The court noted petitioner's body language while respondent (appearing *pro se*) had cross-examined her: "She was so afraid of you and is so afraid of you she wouldn't even look in your direction." The court explained that respondent's contacts with petitioner were "unwanted" and caused her "fear for her physical well-being." It stated that petitioner had tried to tell respondent that she was not interested, then had gone to her family for help because respondent was "creeping [her] out," and "finally, when you did not heed the call, you did not back off, for whatever reasons in your own mind, she had to go to the authorities."

Respondent appeals the resulting judgment, arguing that the evidence was insufficient for an SPO. He also appeals a supplemental judgment for attorney fees.

## ANALYSIS

We begin our analysis with the applicable legal principles. The trial court issued the SPO pursuant to ORS 30.866, Oregon's civil stalking statute. Under that statute, as relevant here, a person may bring a civil action for an SPO against someone who "intentionally, knowingly or recklessly engages in repeated and unwanted contact with" the petitioner, "thereby alarming or coercing" the petitioner, if "[i]t is objectively reasonable for a person in the [petitioner]'s situation to have been alarmed or coerced by the contact," and if "[t]he repeated and unwanted contact causes the [petitioner] reasonable apprehension regarding [the petitioner's] personal safety." ORS 30.866(1).

Thus, to obtain an SPO, a petitioner must prove by a preponderance of the evidence:

(1)  that the respondent engaged in "repeated and unwanted contact" with the petitioner;

(2)  that the petitioner was subjectively alarmed or coerced by the contact and that such alarm or coercion was objectively reasonable;

(3)  that the petitioner subjectively experienced apprehension about personal safety as a result of the contact and that such apprehension was objectively reasonable; and

(4)  that the respondent acted with the requisite mental state.

*Miller*, 269 Or App at 223 (elements); *see also* ORS 30.866(7) (standard of proof).

For purposes of ORS 30.866(1), "contact" is broadly defined and, as relevant here, includes "[c]oming into the visual or physical presence" of the petitioner. ORS 163.730 (3)(a). "Repeated" means "two or more times." ORS 163.730(7). "Alarm" means "to cause apprehension or fear resulting from the perception of danger," ORS 163.730(1), with "danger" in this context meaning "a threat of physical injury, not merely a threat of annoyance or harassment." *Reitz v. Erazo*, 248 Or App 700, 706-07, 274 P3d 214 (2012). Physical injury includes sexual assault. *Daves v. Kohan*, 282 Or App 243, 252, 385 P3d 1161 (2016), *rev den*, 361 Or 439 (2017).

Because of the constitutional protections for speech, speech-based contacts only constitute qualifying contacts for SPO purposes when they "rise to the level of a threat," that is, "the sort of communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." *Miller*, 269 Or App at 223 (distinguishing "the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee"); *but see also Reitz*, 248 Or App at 706 (recognizing that, "[a]lthough a 'contact' based on speech must be

a threat, speech communications that do not meet that standard, nevertheless, are relevant context for nonexpressive contacts" (internal quotation marks and ellipsis omitted)).

As for the requisite mental state, the respondent "must act intentionally, knowingly, or recklessly respecting the repeated and unwanted nature of the contacts in question." *Delgado v. Souders*, 334 Or 122, 132, 46 P3d 729 (2002). To act intentionally is to "act with a conscious objective to engage in repeated and unwanted contact." *Id.* at 133. To act knowingly is to "act with awareness that [one] is engaging in repeated and unwanted contact." *Id.* To act recklessly is to "be aware of and then consciously disregard a substantial and unjustifiable risk that [one] is engaging in repeated and unwanted contact," which "risk must be of such a degree that a reasonable person would not have disregarded it." *Id.* Thus, regarding the respondent's mental state, the petitioner must prove, at a minimum, that, "in at least two instances of coming into her visual or physical presence, [respondent] had been aware of a substantial and unjustifiable risk that she did not want [him] in her presence, and then consciously had disregarded that risk when a reasonable person would not have done so." *Id.* at 134.

With that legal framework in mind, we turn to the record in this case. Our task is to "determine whether petitioner presented enough evidence, as a matter of law, to permit reasonable persons to conclude that the evidence established each element by the requisite burden of proof (here, preponderance of the evidence)." *Ragsdale v. Fleming*, 265 Or App 342, 348, 336 P3d 534 (2014) (internal quotation marks and brackets omitted.). Although it is a close case, we conclude that petitioner met that burden here and, accordingly, that the trial court did not err in granting the SPO.

Respondent concedes—and appropriately so—that the bagel-shop incident in July in which he put his hand on petitioner's upper thigh was a qualifying contact for purposes of an SPO. That is, respondent concedes, and we agree, that there was sufficient evidence that that was an unwanted contact, that it subjectively alarmed petitioner and that such alarm was objectively reasonable, that it subjectively caused petitioner apprehension about her personal

safety and that such apprehension was objectively reason-
able, and that respondent acted at least recklessly. As such,
the only question is whether there was at least one other
qualifying contact for SPO purposes. *See Reitz*, 248 Or App
at 706 (only two qualifying contacts are necessary to obtain
an SPO).

We agree with respondent that most of the other
contacts cited by petitioner are not qualifying contacts for
SPO purposes.[1] Specifically, as to the June incident at the
coffee shop—the parties' first encounter in which respon-
dent asked petitioner for her phone number and invited her
on a date—the evidence was insufficient to establish any
of the elements of a qualifying contact. As to the August
incident—in which respondent made eye contact and waved
when he saw petitioner outside a nightclub and, two hours
later, stopped his car in the street to talk to her—the evi-
dence was insufficient to establish objectively reasonable
alarm and apprehension about personal safety. Finally, as
to the December deli incident, that encounter was markedly
different from the other contacts (lacking any indication of
romantic or sexual interest), respondent's words did not rise
to the level of a threat, and respondent's nonexpressive con-
duct was insufficient to cause objectively reasonable alarm
and apprehension about personal safety. *See King*, 276 Or
App at 540 ("In the absence of inherently threatening con-
tacts, something more is required than merely 'unsettling,
unusual, or unpleasant' contact." (Quoting *Huber v. Landolt*,
267 Or App 753, 760-61, 341 P3d 175 (2014).)).

There is one contact, however, that we agree with
petitioner was a second qualifying contact for SPO pur-
poses: the September incident in which respondent pushed
between petitioner and her walking companion and grabbed
petitioner around her waist. Respondent testified that rudely
walking past or between someone is a "practical joke that
[he] do[es] with a lot of people." He argues that the evidence
was insufficient to establish that he acted with the requisite
mental state or that petitioner's alarm and apprehension

---

[1] The trial court did not specify which contacts it considered to be qualifying
contacts for the SPO, so we have considered all of the contacts cited by petitioner.

from that incident were objectively reasonable. We disagree on both points.

As for the requisite mental state, the evidence is sufficient to allow a finding that respondent was "aware of a substantial and unjustifiable risk" that petitioner would not want him to make physical contact with her and chose to "consciously and unreasonably disregard that risk," *i.e.*, that he was reckless. *Delgado*, 334 Or at 133. The evidence does not *compel* that finding. As respondent points out, when he had seen petitioner on the street three weeks earlier, she had asked him for his name and number, without explanation, which could be interpreted as an expression of interest in him. The trial court could have found based on that evidence that respondent did not have the requisite mental state in the September incident.

But that is not the only evidence, and other evidence allowed the contrary finding that the trial court implicitly made. Respondent himself testified that, between the August crosswalk encounter and the September waist-grabbing incident, he saw petitioner in the building where he works (and where she attends classes), and she turned and walked away from him "like she was frightened." In the context of their prior interactions—including petitioner turning down respondent's offer of a date, not giving him her phone number, walking out of the bagel shop after he grabbed her upper thigh, and avoiding him at the night-club—that visibly fearful reaction to seeing respondent was sufficient evidence to support a finding of recklessness as to the September contact.

Whether the evidence was sufficient to establish that petitioner's alarm and apprehension about the September contact were objectively reasonable is a more difficult question. It is undisputed that petitioner was subjectively alarmed and apprehensive—the only dispute is about whether such alarm and apprehension were objectively reasonable. *See* ORS 30.866(1)(a)‑(c) (imposing subjective and objective requirements). Given the bagel-shop incident, it is reasonable to infer from the evidence that, although petitioner never said so expressly, the threat that she subjectively perceived was a threat of sexual assault. *See Daves*,

282 Or App at 252 ("[A] person in petitioner's situation likely would have experienced apprehension of physical injury in the form of a sexual assault, given the physical and sexually suggestive nature of respondent's unwanted contact.").

Viewed in isolation, it would not be objectively reasonable for petitioner to perceive a threat of sexual assault or experience apprehension about her personal safety based on respondent barging between her and her companion on a public street and briefly grabbing her around the waist before running off. However, we do not view such acts in isolation. "[C]onduct that might appear benign when viewed in isolation can take on a different character when viewed either in combination with or against the backdrop of one party's aggressive behavior toward the other." *Braude v. Braude*, 250 Or App 122, 130, 279 P3d 290 (2012); *see also Allen v. Halvorson*, 267 Or App 374, 378-79, 341 P3d 120 (2014) ("In assessing the reasonableness of a person's apprehension, we examine the cumulative effect of the relevant unwanted contacts on that person.").

Petitioner and respondent were strangers to each other. *See Daves*, 282 Or App at 253 ("A court may consider all of the evidence in combination, including the relationship between the parties, to determine whether a petitioner suffered actual and reasonable apprehension regarding her personal safety."). They met at all only because respondent saw petitioner on the street, followed her into a coffee shop, and asked her out. By September, petitioner had repeatedly indicated a lack of interest in respondent, including rebuffing his advance in the coffee shop in June, leaving quickly after he grabbed her upper thigh at the bagel shop in July, avoiding him at a nightclub in August, telling him later that same August night that it was weird that he had shown up in a crosswalk, and looking fearful when she saw him in the building where she attends classes.

Most importantly, petitioner inevitably would view any physical contact initiated by respondent—who, again, was essentially a stranger to her—through the lens of his having told her in June that he had watched her closely at a nightclub the week before but did not talk to her because he was trying to avoid seeming "creepy" and his then having

grabbed her upper thigh, despite their not knowing each other and her having previously told him that she was in a relationship and was not interested in dating him. Any unconsented touching of petitioner by respondent would be more alarming and cause more apprehension given that prior encounter. *See Daves*, 282 Or App at 253-54 (where the respondent was aware of the petitioner's negative reaction to his first unwanted physical contact, his "willingness to continue to engage in such behavior, combined with the physical and sexually suggestive nature of his contacts, supports the court's conclusion that petitioner's apprehension for her personal safety was subjectively and objectively reasonable").

What is subjectively alarming varies by person, and some women might find respondent's conduct annoying or harassing but not be alarmed by it or experience apprehension for their personal safety. Certainly, the degree of petitioner's subjective alarm and apprehension may have been heightened by her not knowing that respondent worked in the building where she attends classes, leaving her to wonder why he was "constantly" showing up there. It does not follow, however, that it was not objectively reasonable for petitioner to experience enough alarm and apprehension from the September incident to meet the requirements for an SPO. Similarly, the possibility that respondent did not actually intend any harm to petitioner does not preclude the issuance of an SPO. The evidence was sufficient to allow the trial court to find that, under the circumstances as a whole, petitioner's subjective apprehension about her physical safety and subjective alarm when respondent barged between her and her companion and grabbed her around the waist—that is, apprehension or fear resulting from the perception of danger of physical injury, specifically sexual assault—were objectively reasonable.[2]

In so concluding, we recognize that SPOs have significant collateral consequences to respondents and should not be granted lightly. For example, SPOs are entered into

---

[2] To the extent that respondent suggests that a "joke" is expressive and thus subject to Article I, section 8, protection, the trial court did not have to credit respondent's characterization of his conduct as a "joke," and, in any event, it is petitioner's physical touching of petitioner, not what he said, that gives rise to the qualifying contact.

Oregon's law enforcement data system and a national database. *See* ORS 163.741(2); ORS 30.866(11). Persons subject to SPOs cannot possess firearms. ORS 166.291(1)(m). SPOs also carry potential immigration consequences. *See* 8 USC §§ 1182-1187. We also recognize that how we construe and apply the elements of a civil SPO may have practical ramifications in criminal cases, given similarities between the elements of a civil SPO and the elements of criminal stalking.

As such, we emphasize that an SPO is not available in every case in which a person is overly persistent in trying to get a date or acts in a clueless or boorish manner. To the contrary, we have reversed SPOs in cases involving far more persistent respondents. *E.g.*, *Roth v. King*, 272 Or App 381, 356 P3d 153 (2015) (reversing SPO in case in which the respondent repeatedly made advances to the petitioner, including sending texts, leaving voicemails, and leaving items at her home, despite her repeated rejection of his advances, her requests that he stop, and his being told by police not to contact her); *Courtemanche v. Milligan*, 205 Or App 244, 250-51, 134 P3d 999 (2006) (Reversing SPO but stating, "We do not, of course, condone respondent's conduct," which was "persistent to the point of being obsessive—and, in some instances, can be most charitably characterized as strange, boorish, and offensive."); *but see also Van Buskirk v. Ryan*, 233 Or App 170, 177, 225 P3d 118 (2009) (Affirming SPO where the respondent sent dozens of letters and emails to the petitioner, came to her workplace repeatedly to try to see her, and tried to contact her through her parents, despite being told repeatedly by the petitioner and others to stop contacting her; "In light of respondent's many communications, the noncommunicative contacts form a pattern of behavior that made petitioner's apprehension reasonable.").

As previously noted, this is a close case. The parties had relatively few direct encounters, they occurred sporadically over a period of six months, and they all took place in public under circumstances suggestive of chance encounters. Moreover, petitioner did not tell respondent that she wanted no contact with him, and he did not get that message from petitioner's uncle and stepfather until after the second qualifying contact. Ultimately, however, the evidence is sufficient

to support an SPO. Unlike cases involving purely expressive contacts, respondent engaged in unsolicited physical touching of petitioner on two occasions—first grabbing her upper thigh, and later pushing between her and a companion and grabbing her waist—despite their essentially being strangers and despite petitioner having expressly declined to date him and, prior to the second contact, having avoided him and been visibly frightened by seeing him. That is sufficient evidence—if just barely—to support an SPO.

Affirmed.