No. 182 March 20, 2024 555

***This is a nonprecedential memorandum opinion
pursuant to ORAP 10.30 and may not be cited
except as provided in ORAP 10.30(1).***

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

K. D. G.,
*Petitioner-Respondent,*

*v.*

JAMES DARREN SMITH,
*Respondent-Appellant.*

Klamath County Circuit Court
22SK03455; A180041

Andrea M. Janney, Judge.

Submitted December 21, 2023.

Garrett Ramsey filed the brief for appellant.

No appearance by respondent.

Before Shorr, Presiding Judge, Mooney, Judge, and Hadlock, Judge pro tempore.

HADLOCK, J. pro tempore.

Reversed.

**HADLOCK, J. pro tempore.**

Respondent appeals a judgment entering a permanent stalking protective order (SPO), ORS 30.866, that the trial court entered against him for the protection of petitioner.[1] Petitioner does not appear on appeal. As explained below, we agree with respondent that the trial court erred in concluding that the evidence in this case was sufficient to meet the requirements for an SPO. Accordingly, we reverse.

We summarize the evidence from the SPO hearing in the light most favorable to the trial court's disposition. *See C. Q. R. v. Wafula*, 305 Or App 344, 346, 471 P3d 786 (2020).

For several years, respondent was married to C and they had three children together. That relationship eventually ended, and C obtained a protective order against respondent that later expired. According to C, respondent once violated a restraining order by showing up to her home, but the record does not reflect when that happened.

At some point, C formed a new romantic relationship with petitioner. In 2021, respondent began sending unsolicited messages to petitioner via Facebook Messenger and Instagram. The messages were vulgar, extremely critical and disparaging of C, and reflected respondent's unhappiness that petitioner was developing relationships with the three children. In those messages, respondent said that petitioner should "stay the fuck away from [his] kids," should not "be loving on [his] fucking kids," and should not "ever touch [his] kids." Other messages reflected similar sentiments, including a message in which respondent voiced anger that petitioner had allowed one of the young children to go into a cave where respondent thought snakes might be present; respondent indicated that he would have "smacked

---

[1] In civil stalking proceedings, the party applying for relief is called the "petitioner" and the party against whom relief is sought is called the "respondent." We acknowledge that "that nomenclature can be confusing in an appeal like this, where the 'respondent' below is the appellant, and the 'petitioner' below is the respondent [on appeal.]" *Schiffner v. Banks*, 177 Or App 86, 88 n 1, 33 P3d 701 (2001). Nonetheless, in accordance with our rule governing the designation of parties in briefs, ORAP 5.15, references to "petitioner" in this opinion are to the individual who sought the SPO and references to respondent, in the body of the opinion, are to Smith.

[petitioner's] ass" if he had been there. At one point, respondent mentioned having a friend in the Secret Service who was "going to come in because he knows all about [C]" and illegal acts that respondent claimed she had engaged in.

Petitioner did not respond to respondent's messages until, after several months, petitioner told respondent not to contact him anymore. The messages stopped after a few more brief exchanges that same day, with respondent's last message stating that petitioner should "just remember those kids are mine."

As relevant to this case, one more event occurred after respondent's messages stopped. Petitioner explained at the SPO hearing that he had taken steps to ensure that respondent did not know where petitioner lived with C and the children. Notwithstanding those efforts, respondent found the address and—sometime after the messages from respondent had ceased—a man arrived at petitioner's house and left flowers, balloons, and some notes on the doorstep as a birthday gift for one of the children. One note said, "You will always be Daddy's princess." One of the children saw the man, whom he described as having gray hair. C believed that the man who delivered the flowers was respondent, in part because "there was no florist notation on the flowers anywhere." C testified that the children "now state a lot of fear of the fact that [respondent] now knows where we live." The day after the flowers were delivered, a teacher reported that one of the children "was afraid to be at school because he thought his dad was going to come and take him." C also fears for her physical safety because respondent knows where she lives. Petitioner, too, is concerned by that fact.

Respondent also testified at the hearing. He acknowledged learning petitioner's address and sending flowers there, but he asserted that somebody else had delivered them.

Toward the close of the hearing, the trial court made a finding that respondent had "showed up at [petitioner's and C's] house" with the flowers, and the court characterized respondent's behavior as "extraordinarily disturbing." The court further stated that "the context and the frequency

and the manner of [respondent's] speech and the words that [he] said could absolutely be construed as threatening." The court then entered the final SPO and judgment from which respondent appeals.

Under ORS 30.866, a petitioner may obtain an SPO against a respondent if:

"(a)   The respondent intentionally, knowingly or recklessly engages in repeated and unwanted contact with the petitioner or a member of the petitioner's immediate family or household thereby alarming or coercing the petitioner;

"(b)   It is objectively reasonable for a person in the petitioner's situation to have been alarmed or coerced by the contact; and

"(c)   The repeated and unwanted contact causes the petitioner reasonable apprehension regarding the personal safely of the petitioner or a member of the petitioner's immediate family or household."

ORS 30.866(1).

As relevant to this case, "contact" includes waiting outside the home of a petitioner or a member of the petitioner's family or household, sending written or electronic communications in any form to the petitioner, or delivering (directly or through a third person) any object to the petitioner's home. ORS 163.730(3)(c), (d), (k). Contact is "repeated" if it happens "'two or more times.'" *K. M. V. v. Williams*, 271 Or App 466, 469, 351 P3d 808 (2015) (quoting ORS 163.730(7)). Each of the contacts "individually must give rise to subjective and objective reasonable alarm or coercion." *Id*. "Alarm" means "'apprehension or fear resulting from the perception of danger.'" *Id*. (quoting ORS 163.730(1)). And, in this context, "danger" means "a threat of physical injury, not merely a threat of annoyance or harassment." *M. F. v. Baker*, 325 Or App 787, 789, 530 P3d 142 (2023) (internal quotation marks omitted). We have described a "contact" as "qualifying" for purposes of ORS 30.866 only if it meets those statutory requirements. *See, e.g.*, *C. Q. R.*, 305 Or App at 353-54.

Under our current case law, *State v. Rangel*, 328 Or 294, 977 P2d 379 (1999), requires that heightened standards apply when a claimed unwanted contact constitutes

"expressive communication." An expressive communication can be a qualifying contact only if it "rise[s] to the level of a threat." *C. Q. R.*, 305 Or App at 352 (internal quotation marks omitted). That is, it must be "the sort of communication that instills in the addressee a fear of imminent and serious personal violence from the speaker," it must be "unequivocal," and it must be "objectively likely to be followed by unlawful acts." *Id*. (internal quotation marks omitted); *see also J. S. v. Hudgins*, 329 Or App 176, 179, 540 P3d 599 (2023) (setting forth same standard and quoting *Rangel*). "The kinds of threatening contacts that may support the issuance of a stalking protective order do not include the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee." *M. F.*, 325 Or App at 790 (quoting *A. M. M. v. Hoefer*, 269 Or App 218, 223, 344 P3d 121 (2015)).

In issuing the SPO, the trial court found that the requirements outlined above were met. Because this is not a case that warrants *de novo* review, "we view the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record is legally sufficient to permit that outcome." *K. M. V.*, 271 Or App at 467.

Respondent argues on appeal, among other things, that none of the messages from respondent to petitioner count as qualifying contacts because they cannot satisfy the heightened standard for expressive communications. He contends that the record includes no evidence that the messages were "truly threatening" and instilled "a fear of imminent and serious personal violence from the speaker." Respondent also contends that the record includes no evidence that his messages were "objectively likely to be followed by unlawful acts."

We agree with respondent that the messages do not qualify as unwanted contacts for purposes of ORS 30.866, given their expressive nature. The messages are extremely unpleasant, and petitioner reasonably could find them disturbing. However, the messages are not objectively threatening in the sense that *Rangel* requires. First, they include no express threats of future physical harm at all, much

less threats that are "unequivocal." The only message that alludes to physical violence is the one in which respondent says what he *would have done* ("smacked [petitioner's] ass") if he had been present when, he believed, petitioner put one of the children in a dangerous situation. And even if respondent's demands that petitioner stay away from the children could be understood to imply consequences if petitioner continued developing his relationship with them, nothing about the messages suggests what those consequences might be. Thus, the messages were not the sort of communication that instills a fear of "imminent and serious personal violence." *C. Q. R.*, 305 Or App at 352. Nor do the messages themselves or anything else in the record support a finding that the messages were "objectively likely to be followed by unlawful acts," as *Rangel* also requires. *See J. S.*, 329 Or App at 179.

Thus, we conclude that none of the messages qualified as an unwanted contact for purposes of an SPO. It follows that we need not decide whether the flower delivery qualified as an unwanted contact because, even if it did, it would be only one contact—and one contact is insufficient to justify issuance of an SPO. Because ORS 30.866 requires evidence of at least two qualifying contacts, the trial court erred when it issued the SPO in this case.[2]

Reversed.

---

[2] During the hearing, the trial court repeatedly expressed familiarity with the parties and their history, stating that there were other "restraining orders" that "verify that [respondent] had threatening and abusive behavior" that was "well documented." The court noted that it had presided over those other "restraining order hearings" as well as "your custody case" and "the DHS cases," aspects of which the trial court discussed at the SPO hearing. It appears that the court may have based the SPO in this case in part on its previous experiences with the parties in those other cases. However, none of the evidence from those other cases was introduced into evidence in this case; nor did the trial court take judicial notice of the filings or judgments in those cases. Yet an SPO can issue based only on the evidence that is received at the SPO hearing. *Falkenstein v. Falkenstein*, 236 Or App 445, 449-50, 236 P3d 798 (2010). And, on appeal, "we review the sufficiency of the evidence supporting the SPO on the evidentiary record created in the trial court, and do not consider documents or testimony not entered into evidence." *V. L. M. v. Miley*, 264 Or App 719, 720 n 1, 335 P3d 853 (2014). For that reason, we have disregarded the trial court's statements about matters not in evidence and we have not considered whether issuance of an SPO would have been justified if evidence regarding those other cases was part of the record in *this* case.